905 P.2d 54

**Orlando EPP, Plaintiff–Appellant/Cross–Appellee,**

v.

**Doris EPP, Defendant–Appellee/Cross–Appellant.**

**No. 15732.**

Intermediate Court of Appeals of Hawai'i.

Oct. 3, 1995.

82

Paul A. Tomar, Law Office of Bradley A. Coates, Honolulu, for plaintiff-appellant/cross-appellee.

Charles T. Kleintop (Carolyn O. Tavoularis and Patrick Naehu with him on the briefs; Stirling & Kleintop, of counsel), Honolulu, for defendant-appellee/cross-appellant.

Before BURNS, C.J., and WATANABE and ACOBA, JJ.

BURNS, Chief Judge.

Plaintiff Orlando Epp (Husband) appeals the family court's August 30, 1991 Decree Granting Divorce and Awarding Child Custody (August 30, 1991 Divorce Decree) and October 9, 1991 "Order Following Hearing on Plaintiff's Motion for Reconsideration Filed July 23, 1991" and "Defendant's Motion for Reconsideration and/or Clarification Filed July 23, 1991" (October 9, 1991 Order). Defendant Doris Epp (Wife) cross-appeals the August 30, 1991 Divorce Decree. We (1) vacate (a) the property division and distribution part of the August 30, 1991 Divorce Decree and (b) the October 9, 1991 Order and (2) remand for further proceedings in accordance with this opinion.

## BASIC FACTS

Husband was born in 1920. Wife was born in 1934. Their date of marriage (DOM) was January 19, 1978. There were no children of the marriage.

After thirty-two years of service in the United States Army, Husband retired as a brigadier general in 1974 and, since that time, has been receiving monthly military disability payments based on a forty percent disability and military retirement monthly payments and benefits. Husband testified that, although the disability payments are offset against his retirement payments, the disability payments are nontaxable. In 1979, Husband's military disability/retirement gross cash benefit was $2,900 per month or $34,800 per annum. In 1982, it was $3,789.08 per month or $45,469 per annum.

In the early years of the marriage Wife's taxable income was as follows:

|  | 1978 | 1979 | 1980 | 1981 |
|---|---|---|---|---|
| Real Estate Business | 10,037 | (1,003) | 10,363 | (1,036) |
| Capital Gain | 18,701 | 28,924 |  | 9,391 |
| Supplemental Gain |  | 1,639 |  | 4,818 |
| Rents | (12,891) | (21,009) | (3,546) | (8,841) |
| Other |  | 2,300 |  |  |
| Interest |  |  |  | 9,446 |
| TOTAL | 15,870 | 10,851 | 6,817 | 13,778 |

Eleven days prior to the DOM, Wife gave her 99–252 'I'ini Way, 'Aiea Heights, property to her daughter Marcelle. When the parties married, Wife owned the following real property:

92–608 Palailai Street, Makakilo

4363 Olaloa Street, Foster Village

98–069 Puahau Place, Pearl Ridge

99–442 Kekoa Place, Hālawa Heights

one-half of 2211 Ala Wai Boulevard, Apartment No. 2103, Waikīkī [1]

99–1161 'Aiea Heights Drive, 'Aiea Heights

When the parties married, Husband owned 1805 Kūmakani Place, Wai'alae Iki.

When the parties married, Wife moved from her 'Aiea Heights residence into Husband's Wai'alae Iki residence. The parties lived there with Wife's two daughters and Husband's two sons. In 1980, Wife gave her 'Aiea Heights Drive property to her daughter Malia. In the latter part of 1978, the parties purchased the 19 Kai Nani Place, Kailua beachfront leasehold property for $287,328 by way of Agreement of Sale (A/S). The A/S did not require any monthly payments. Interest accrued at the rate of nine percent per annum. From the sale of their Category 1 properties (Wife's Palailai Street, Olaloa Street, and Puahau Place, and Husband's Kūmakani Place), each of the parties paid the following amounts toward the purchase of the Kai Nani Place property: Wife paid $51,000 on the Kai Nani Place A/S in 1978; Wife paid $82,162 on the Kai Nani Place A/S in 1979; and Husband paid $75,000 on the Kai Nani Place A/S in 1980. The parties purchased the fee of the Kai Nani Place property in 1981 for $106,174 with borrowed money. Toward that debt, Wife paid $22,000 in 1981 and $65,000 in 1982.

Specifically with respect to the Kai Nani Place property, Wife's Exhibit F shows that the parties borrowed $17,000 from the Bank of Hawaii in 1979, refinanced the A/S debt with a City Bank loan of $90,000 in 1980,

1. Apartment No. 2103 is the number stated in Finding of Fact No. 6(b). Exhibit C2, Wife's Asset and Debt Statement dated May 30, 1991, states that the number of this apartment is 3203.

refinanced the Bank of Hawaii debt with a Fort Shafter Credit Union loan of $20,500 in 1980, refinanced with a Honolulu Mortgage loan of $127,000 in 1985, refinanced with a Honolulu Mortgage loan of $123,850 in 1987, and borrowed $15,000 from the Hickam Federal Credit Union in 1987. On the day of the conclusion of the evidentiary part of the trial (DOCOEPOT), the Kai Nani Place mortgage debt was $120,000.

In 1983, Wife started her Pacific–Hawaii Bed and Breakfast business. This business involved (a) a referral service to client landlords seeking bed and breakfast tenants, (b) bookkeeping services for client landlords, and (c) renting two of the Kai Nani Place bedrooms to bed and breakfast tenants.

Wife testified that, since prior to 1987, she and Husband each purchased their own food and prepared their own meals and, since approximately 1987, they lived in separate bedrooms in the Kai Nani Place residence.

Wife purchased a fifty percent interest in Apartment 404–A, 1030 Aoloa Place, Kailua, in December 1987.

Husband filed his Complaint for Divorce on December 4, 1989. The DOCOEPOT was June 13, 1991. On the DOCOEPOT, Wife's bed and breakfast business was generating a gross monthly income of $1,837. The $3,805 which she received in monthly rental income for her investment properties (Kekoa Place, Ala Wai Boulevard and Aoloa Place) was offset by her monthly mortgage, insurance, repair, maintenance and utility expenses totalling $3,898 plus applicable gross income and hotel taxes. On the DOCOEPOT, Husband's gross disability/retirement and social security cash benefits exceeded $5,600 per month.

## DISCUSSION

### I.

The parties' cash, personal effects, furniture and furnishings, vehicles, credit union and bank accounts, life insurance, and debts were distributed as specified by the August 30, 1991 Divorce Decree. The distribution of these items is not an issue in this appeal.

The first issue pertains to the division and distribution of the net market values (NMVs) of the real properties owned by one or both parties on the DOM and/or on the DOCOE-POT.

■ With respect to marriages, three relevant agreements between the marital partners are possible: (1) premarital or antenuptial agreements in contemplation of marriage (premarital agreements); (2) during-the-marriage agreements not in contemplation of divorce (marital agreements); and (3) during-the-marriage agreements in contemplation of divorce (divorce agreements).

■ Prior to the enactment of Hawai'i Revised Statutes (HRS) ch. 572D in 1987 (Hawai'i's Uniform Premarital Agreement Act) and the 1987 amendment to HRS § 572–22, marital partners could not, by a valid premarital agreement, marital agreement or divorce agreement, inhibit the family court's jurisdictional power/authority, pursuant to HRS § 580–47(a) (1993), to "make such further orders as shall appear just and equitable ... (3) finally dividing and distributing the estate of the parties, real, personal, or mixed, whether community, joint, or separate[.]" Thus, in *Lewis v. Lewis*, 7 Haw.App. 155, 159, 747 P.2d 698, 701 (1986), *aff'd in part and vacated in part*, 69 Haw. 497, 748 P.2d 1362 (1988), we concluded that Hawai'i's "public policy as stated in HRS § 580–47 takes precedence over the parties' right to enforce their antenuptial agreements." Now, however, the reverse is true. *Lewis*, 69 Haw. at 500–01, 748 P.2d at 1365–66.

Similarly, as a result of the 1987 legislature's passage of Act 194, which became effective upon its approval on June 6, 1987, Hawai'i's public policy as stated in HRS § 580–47 no longer takes precedence over the parties' right to enforce their valid and enforceable marital agreements and divorce agreements. Act 194 amended HRS § 572–22 as follows:

> **Contracts.** A married person may make contracts, oral and written, sealed and unsealed, with [persons other than] her or his spouse, *or any other person,* in the same manner as if she or he were sole.

[Spouses may contract with each other, as follows:

(1) By deed or assignment to or in favor of the other;

(2) By agreement settling their respective rights in property owned by them, or either of them, when the agreement is made in contemplation of divorce or judicial separation;

(3) By] *An* agreement *between spouses* providing for periodic payments for the support and maintenance of one spouse by the other, or for the support, maintenance, and education of children of the parties, when the agreement is made in contemplation of divorce or judicial separation[;], *is valid* provided that the agreement shall be subject to approval by the court in any subsequent proceeding for divorce or judicial separation and that future payments under an approved agreement shall nevertheless be subject to increase, decrease, or termination from time to time upon application and a showing of circumstances justifying a modification thereof[;].

[ (4) By partnership agreements for business purposes;

(5) As provided in section 560:2–204.] All contracts made between spouses, whenever made, whether before or after the effective date of this Act, and not otherwise invalid because of any other law, shall be valid.

1987 Haw.Sess.L. Act 194, § 1 at 434 (statutory material repealed is bracketed, new statutory material is underscored).

Although the following quotation addresses HRS § 572D–10 and premarital agreements, it applies equally to HRS § 572–22 and marital agreements and divorce agreements.

Section 10 of the Hawaii [Hawai'i] Act specifically states that such pre-marital agreements are valid and enforceable if otherwise valid as contracts. Unless the agreement rises to the level of unconscionability, a merely "inequitable" contract is not unenforceable under contract law.

Furthermore, when a premarital agreement setting forth support and property division in the event of divorce is *not unconscionable* and has been *voluntarily* entered into by the parties with knowledge of the financial situation of the prospective spouse, enforcement of the agreement does not violate the principle of a "just and equitable" award under HRS § 580–47.

*Lewis,* 69 Haw. at 500–01, 748 P.2d at 1365–66 (footnote omitted and emphasis in original).

In the following words, footnote 1 of *Lewis* further emphasizes the change: "Nor can it be said that enforcement of inequitable premarital agreements violates public policy as the Hawaii [Hawai'i] Act itself reflects a public policy in favor of enforcement of such agreements." *Id.* at 500 n. 1, 748 P.2d at 1366 n. 1.

Specifically with respect to marital agreements and divorce agreements, the House Judiciary Committee report on H.B. 771, which became Act 194, 1987 Haw.Sess.Laws, amending HRS § 572–22, provides additional support for *Lewis* in relevant part as follows:

The purpose of this bill is to permit spouses to make valid contracts with each other except in one limited circumstance and to ratify any interspousal contracts already made which may violate the existing law.

\*   \*   \*   \*   \*   \*

... Your Committee further finds that in view of contemporary societal standards, spouses no longer need the archaic protections from one another provided in the current law.

Your Committee has amended the bill to reinstate the provision requiring judicial approval of certain support and maintenance agreements when the agreement is made in contemplation of a divorce or legal separation. This provision was inadvertently proposed to be repealed.

Hse.Stand.Comm.Rep. No. 566, in 1987 House Journal, at 1366.[2]

---

2. With respect to matters covered by valid and enforceable premarital agreements, marital agreements, and/or divorce agreements, spouses

"no longer need the archaic protections from one another provided in the current law." With respect to matters not covered by valid and en-

Consequently, all valid and enforceable premarital agreements, marital agreements, and divorce agreements, even those entered into prior to June 6, 1987, must be enforced in divorce proceedings. HRS §§ 572–22, 572D–10.

## II.

The Epps' case was tried in 1991. At that time, except as modified by one or more valid and enforceable premarital agreements, marital agreements, and/or divorce agreements, the following principles provided the framework within which the family court commenced to exercise its equitable jurisdiction:

In [*Cassiday v. Cassiday*, 68 Haw. 383, 716 P.2d 1133 (1986)], the supreme court stated that the family court may award the non-owner spouse no more than 50% of the net market values under categories 2 and 4. Since the net market values under categories 2 and 4 are generated within the marriage, whereas the net market values under categories 1 and 3 are generated outside of the marriage, the non-owner spouse has no less an equitable claim to the net market values under categories 2 and 4 than under categories 1 and 3. Consequently, we conclude that categories 1, 2, 3, and 4 are limited to a maximum 50% award to the non-owner spouse.

In *Cassiday*, the supreme court also stated that "[i]t is generally accepted that each divorcing party is entitled to the date of marriage net value of his or her premarital property and the date of acquisition net value of gifts and inheritances which he or she received during the marriage. *Raupp v. Raupp*, 3 Haw.App. 602, 658

forceable premarital agreements, marital agreements, and/or divorce agreements, the Partnership Model applies to them, and the spouses have the "just and equitable" protection provided in the current law.

Premarital agreements must be in writing and signed by both parties. Hawai'i Revised Statutes (HRS) § 572D–2. Marital agreements, however, may be oral or written. HRS § 572–22. Query whether the legislature fully appreciated the kinds of written and oral marital agreements that are possible, what marital partners will and will not say and do for such marital agreements, and how these words, actions, agreements, and refusals to agree will affect marital relationships and divorce proceedings.

P.2d 329 (1983)." 68 Haw. at [390], 716 P.2d at 1138. It thereby confirmed that the uniform starting point for dividing the net market values under categories 1 and 3 is 100% to the owner and 0% to the non-owner.

In *Cassiday*, the supreme court disapproved a 50–50 uniform starting point for dividing the net market values under categories 2 and 4. Thus, the applicable uniform starting point could be 51–49 or 100–0 or any ratio in between. Considering that the maximum that can be awarded to the non-owner spouse is 50% and the minimum is 0%, we select a 75%–25% uniform starting point for dividing the net market values under categories 2 and 4.

In our view, the uniform starting point for dividing the net market values under category 5 is 50% to the Husband and 50% to the Wife.

*Hashimoto v. Hashimoto*, 6 Haw.App. 424, 427–28, 725 P.2d 520, 523 (1986).

■ Subsequent to the trial of the Epps' case, and except as modified by one or more valid and enforceable premarital agreements, marital agreements, and/or divorce agreements, the above principles were replaced by the Partnership Model. "The partnership model is the appropriate law for the family courts to apply when exercising their discretion in the adjudication of property division in divorce proceedings." *Tougas v. Tougas*, 76 Hawai'i 19, 28, 868 P.2d 437, 446 (1994).

The following statute applies during the marriage but does not in any way inhibit the application of the Partnership Model upon divorce.

The law permits a marital partner to unilaterally terminate the marriage by divorce. It does not permit a marital partner to unilaterally terminate marital agreements. Does the law allow a marital partner to sue his or her spouse during the marriage to enforce a marital agreement? HRS § 572–28 (Supp.1992) states that "A married person may sue and be sued in the same manner as if the person were sole; but this section shall not be construed to authorize suits between spouses." Is divorce the only way for a marital partner to enforce a marital agreement?

In light of the above, the family court in divorce cases must be ready to apply contract law and equitable divorce law.

**Separate property.** The real and personal property of a spouse, upon marriage, shall remain that spouse's separate property, free from the management, control, debts, and obligations of the other spouse, and a spouse may receive, receipt for, hold, manage, and dispose of property, real and personal, in the same manner as if that spouse were sole.

HRS § 572–25 (1993).

The five categories of NMVs of Marital Partnership Property are stated in *Tougas,* 76 Hawai'i at 27, 868 P.2d at 445, and *Hashimoto,* 6 Haw.App. at 425–26, 725 P.2d at 522.

Under the Partnership Model,

1.   The Category 1 and 3 NMVs are the "partner's contributions" to the Marital Partnership Property that, assuming all valid and relevant considerations are equal, are repaid to the contributing spouse; and

2.   The Category 2, 4, and 5 NMVs are Marital Partnership Property that, assuming all valid and relevant considerations are equal, are awarded one-half to each spouse.

*Hussey v. Hussey,* 77 Hawai'i 202, 207–08, 881 P.2d 1270, 1275–76 (App.1994).

In the Epps' case, the relevant Marital Partnership properties, their NMVs on the DOCOEPOT listed by categories, and the percentage awards of those NMVs by the family court are as follows:

| PROPERTY | CATEGORY | NMV | PERCENTAGE AWARD | |
| --- | --- | --- | --- | --- |
| | | | Husband | Wife |
| 92–608 Palailai St. | 1 (Wife) | No Finding | (sold on 10–12–78) | |
| 4363 Olaloa St. | 1 (Wife) | No Finding | (sold on 11–19–79) | |
| 98–069 Puahao Place | 1 (Wife) | No Finding | (sold on 05–26–81) | |
| 99–442 Kekoa Place | 1 (Wife) | $   37,200 | 0 | 100 |
| | 2 | 316,652 | 0 | 100 |
| 50% of Apt. 2103 2211 Ala Wai Blvd. | 1 (Wife) | 3,650 | 0 | 100 |
| | 2 | 60,402 | 0 | 100 |
| 1805 Kūmakani Place | 1 (Husband) | No Finding | (sold in 1980) | |
| 50% of Apt. 404–A, 1030 Aoloa Place | 5 | 58,500 | 10 | 90 |
| 19 Kai Nani Place | 5 | 2,075,000 | 50 | 50 |
| Military retirement | 1 (Husband) | No Finding | 100 | 0 |

### III.

■   One or more valid and enforceable premarital agreements, marital agreements, and/or divorce agreements can modify the Partnership Model in total or in part and/or exclude some or all of the NMVs of the assets and debts of the parties from the Partnership Model.   When deciding the property division issue, the family court first must determine whether and to what extent one or more valid and enforceable premarital agreements, marital agreements and/or divorce agreements modified the Partnership Model in total or in part and/or excluded some or all of the categorized NMVs from the Partnership Model.   The family court must enforce all valid and enforceable modifications and exclusions.   The Partnership Model applies to categorized NMVs of the assets and debts of the parties that are not within the scope of a valid and enforceable modification of, and/or exclusion from, the Partnership Model.

Solely with respect to categorized NMVs to which the Partnership Model applies, the

family court must consider the consequences of all valid and enforceable modifications of, and/or exclusions from, the Partnership Model when deciding whether a relevant and valid consideration authorizes deviation from the Partnership Model.

## IV.

The family court's oral decision was entered on July 3, 1991. Its August 30, 1991 Divorce Decree states in paragraph 6 in relevant part as follows:

> f. *Retirement.* [Husband] shall be awarded as his sole and separate property his U.S. Army retirement. [Husband] may terminate his designation of [Wife] as the beneficiary of Survivor's Annuity Benefits upon the effective date of this Decree.

On July 23, 1991, Wife moved for reconsideration, seeking the following:

> It was [Wife's] position that the Court should divide the proceeds from the disposition of the Kai Nani place property in proportion to the principal reduction that the parties have paid or a 60% vs. 40% division. [Wife] stated that as one of the reasons why the Kai Nani Place property was placed in both names at the time of the acquisition of the fee was that [Husband] agreed to name [Wife] as the primary beneficiary under his survivor benefit provisions under his retirement plan. It is, therefore, [Wife's] position that although the marriage may be terminated, that the bargain for provisions of the survivor benefit should remain, that [Husband] is getting the benefit of his bargain since he is being awarded 50% of the net proceeds of the Kai Nani residence, and that [Husband] thereafter should be required to continue to provide and be responsible for providing the Survivor Benefits under his retirement plan for the benefit of [Wife].

The family court's October 9, 1991 Order granted Wife's motion for reconsideration as follows:

> (a) [Husband] shall ensure that [Wife] is continued as the beneficiary of his Survivor Benefit Plan so long as [Wife] pays the monthly premium to keep the Plan in effect for her benefit.
>
> (b) [Husband] shall not replace, substitute, or add any beneficiary(ies) under his Survivor Benefit Plan so long as [Wife] is the beneficiary of the Plan because she is paying the monthly premium.

## A.

■ Based on his allegation that Wife failed to request such an award at anytime prior to or during trial, Husband contends that Wife should have been barred from asserting a post-decision-pre-decree request for an order requiring Husband to keep Wife as the sole beneficiary of his Survivor Benefit Plan (SBP). We disagree. Although Wife did not express the specifics of an alternative request, it was fairly obvious from her February 6, 1991 position statement that her nonclaim of Husband's SBP was contingent upon her being awarded all of the NMVs of the Kekoa Place, Ala Wai Boulevard, and Aoloa Place properties and all of the NMV of the Kai Nani Place property with the exception of Husband's financial contributions thereto.

## B.

■ The family court in divorce cases must enforce all valid and enforceable premarital agreements, marital agreements, and/or divorce agreements. In her answering brief, Wife cites her uncontradicted evidence

> that she originally planned to acquire the fee simple interest in the Kai Nani Place property in *her* name alone. Because [Husband] wouldn't put up the money to participate in the purchase of the fee simple interest, [Wife] liquidated one of her separate properties in order to raise the funds neces[s]ary to acquire the fee. It was only after [Husband] agreed to name [Wife] as the primary beneficiary under his SBP that she agreed to place the fee in joint names.

(Emphasis in original.)

The family court did not decide whether Husband and Wife had entered into a valid

and enforceable marital agreement. That issue must be decided.

█ Sufficient and legal consideration is an essential element of a valid contract. 17A Am.Jur.2d *Contracts* § 16 (1991). Without deciding this possible sub-issue, we note that, although the placement of the title to the Kai Nani Place property in Wife's separate name rather than in joint names may not have impacted upon the rights of the parties with respect to it and its NMV upon their divorce, the placement of the title in joint names rather than in Wife's separate name did impact upon the rights of the parties with respect to it during the marriage. *See* HRS § 572–22.

█ If Husband and Wife entered into a valid and enforceable marital agreement, its terms must be enforced. In the absence of a relevant marital agreement, the question is whether the family court has the discretion to order Husband to allow Wife to continue as the beneficiary of the SBP at her expense. In 1991, that expense was $463 per month. In our view, in the absence of (a) a valid and enforceable premarital agreement, marital agreement, and/or divorce agreement requiring such an order, (b) a valid and enforceable legal obligation requiring divorcing marital partner A to pay some form of child support, spousal support, retirement benefits, and/or some other payment to divorcing marital partner B after divorcing marital partner A's death, or (c) a compelling reason on the record for such an order, the family court abuses its discretion when it orders divorcing marital partner A to allow divorcing marital partner B, at divorcing marital partner B's expense, to continue to be the beneficiary of insurance payable on the death of divorcing marital partner A. For obvious reasons, the family court should not give one divorcing marital partner any more motivation to desire the demise of the other divorcing marital partner than he or she may already have.

█ When deciding the compelling reason issue, the family court should determine what effect, if any, Husband's death after the divorce and prior to Wife's death would have on Wife's financial condition such that it is equitable for her to be ensured against that possibility.

## V.

█ In determining whether one or more valid and relevant considerations authorize the family court to deviate from the Partnership Model, the family "court shall take into consideration: the respective merits of the parties, the relative abilities of the parties, the condition in which each party will be left by the divorce, the burdens imposed upon either party for the benefit of the children of the parties, and all other circumstances of the case." HRS § 580–47(a) (1993). Other than the relative circumstances of the parties when they entered into the marital partnership and possible exceptional situations, the above quoted part of HRS § 580–47(a) requires the family court to focus on the present and the future, not the past.

## VI.

Husband contends that the family court abused its discretion when it awarded him none of the Category 2 NMVs of the Kekoa Place and Ala Wai Boulevard properties, and only ten percent of the Category 5 NMV of Wife's half of the Aoloa Place property. Wife contends that the family court abused its discretion when it did not award her more than fifty percent of the Category 5 NMV of the Kai Nani Place property.

As noted above, Wife owned the Palailai Street, Olaloa Street, and Puahao Place properties on the DOM. Wife sold these properties in the early years of the marriage and used the proceeds to pay $220,162 [3] towards the purchase of the Kai Nani Place leasehold and fee.

Husband owned the Kūmakani Place property on the DOM. He sold it in 1980 and netted $125,000. He used $75,000 to reduce the Kai Nani Place debt.

---

**3.** As noted in the Basic Facts section above, Wife paid the following amounts: $51,000 + $82,162 + $ 22,000 + $65,000.

The family court's relevant findings of fact (FsOF) and (CsOL) are as follows:

8. Since the DOM, and during their 11 year marriage, the parties have treated their earnings separately, maintained separate expenses, accumulated separate estates, and filed separate tax returns, with the following exceptions:

(a) Joint title in the Kai Nani Place property.

(b) A joint mortgage debt to Honfed, secured by the Kai Nani Place property.

(c) A joint second mortgage debt to Hickam Federal Credit Union, secured by the Kai Nani Place property.

(d) A joint savings account at Hickam Federal Credit Union in a historically nominal and inactive amount, opened for purposes of taking out the joint loan indicated in 8(c) above.

(e) A joint checking account held for less than one year from late 1978 or early 1979, through September, 1980.

(f) Joint tax returns for 1983, 1984, 1985, and 1986.

\* \* \* \* \* \*

15. Wife paid sixty percent (60%) of the purchase price and/or acquisition price of the Kai Nani Place property and Husband paid the remaining forty percent (40%). However, Husband made the majority of the payments on the Kai Nani Place mortgage.

\* \* \* \* \* \*

18. With regard to Wife's separately titled Kekoa Place property, Husband did not participate in the purchase financially or otherwise, made no direct monetary contributions to the property for the maintenance and preservation of said property, made no mortgage contributions, made no repairs to the property, did not participate in the refinancing of the property, and did not participate in the management of the property.

\* \* \* \* \* \*

20. With regard to Wife's separately owned fifty percent (50%) interest in the Ala Wai Boulevard property during the marriage: Husband did not participate in the purchase financially or otherwise, made no direct monetary contributions to the property for the maintenance and preservation of said property, made no mortgage contributions, made no repairs to the property, did not participate in the refinancing of the property, and did not participate in the management of the property.

\* \* \* \* \* \*

22. With regard to the fifty percent (50%) interest in the Aoloa Place property purchased by Wife in December, 1987, during the marriage: Husband did not participate in the purchase financially or otherwise, made no direct monetary contributions to the property for the maintenance and preservation of said property, made no mortgage contributions, made no repairs to the property, did not participate in the refinancing of the property, and did not participate in the management of the property.

\* \* \* \* \* \*

24. Based on the evidence adduced at trial, Husband did not contribute in any significant manner to the maintenance and preservation of any of the premarital assets Wife brought to the marriage, or to any assets she purchased during the marriage.

\* \* \* \* \* \*

26. Husband came into the marriage with a substantial retirement pension.

27. Wife has no retirement pension.

28. Husband has maintained Wife as beneficiary of his survivor benefit plan since 1981.

29. Wife relied on the security of being the named beneficiary of Husband's survivor benefit plan.

## CONCLUSIONS OF LAW

\* \* \* \* \* \*

12. It is fair and equitable that Husband continue his Survivor Annuity Benefits under the U.S. Army Retirement Plan in effect and maintain Wife as the primary

beneficiary thereunder, provided Wife pays the associated monthly premium....

In the interest of fairness, we note in passing that the above findings ignore the sources of the funds used to pay for the family's personal and household expenses while the marital partners were living at the Kūmakani Place residence and after they moved into the Kai Nani Place residence.

The above findings also ignore the cooperation of the marital partners with respect to financing. For example, Exhibit W–2, which appears to be a financial statement prepared by Wife in early 1979 in connection with an application for a loan, states in relevant part as follows:

ADDENDUM TO PERSONAL FINANCIAL STATEMENT:

(1) Amount estimated. Am involved with real estate and numerous projects some on consultant basis. No fixed monthly income.

(2) Federal and state income taxes for both me and spouse have been paid throughout year. However, 1978 income taxes have as yet been neither computed nor filed. Taxes may exceed amount paid.

(3) Present residence purchased on agreement of sale; no payments of either interest or principal until November 1979. Proceeds from equity on two residences now on market will be used to retire agreement of sale and pay interest.

(4) Explanation of status of properties:

Kūmakani residence is now for sale. Mortgage payments of $1240 continue, with no income, until sold.

'Aiea Heights residence also on the market. As of March 15 this property will have no income; small mortgage payments continue until sold.

Hutchinson, Kansas property has been sold and is now in escrow.

All other properties listed, with exception of our Kai Nani residence, have mortgages. However, rental income provides positive cash flow when considering write-offs for taxes, interest and depreciation.

The family court found that Wife paid sixty percent of the purchase price of the Kai Nani Place property and Husband paid forty percent. Wife contends that she paid seventy-three percent and Husband paid twenty-seven percent. In our view, the dispute is irrelevant because, under the Partnership Model, the finding is not material.

In *Richards v. Richards*, 44 Haw. 491, 355 P.2d 188 (1960),

[Husband] owned 1200 shares of Kahua [Ranch, Limited] at the time of the marriage [in 1938]. He purchased 405 shares after the marriage. There is evidence that he had sufficient funds of his own to make the purchase. Inasmuch as Kahua has 3200 shares outstanding, the purchase made [husband] the majority stockholder of the corporation by 5 shares.

\* \* \* \* \* \*

Here, the record does not show that [wife] established a meritorious claim to division of property other than household paraphernalia. Except as to household paraphernalia, it cannot be said from the evidence adduced at the hearings that [wife] contributed any property of her own to the building up of [husband's] estate or that she lent any effort to the accumulation of any portion of such estate.

*Id.* at 511–13, 355 P.2d at 200.

To the extent, if any, that *Richards* requires the non-owner marital partner to prove that he or she contributed to the accumulation of the Category 2 and Category 5 NMVs of the other marital partner's Marital Partnership Property before he or she has a meritorious claim to an equitable share of it, *Richards* has been superseded by the Partnership Model.

The following principle enunciated by this court in *Gussin v. Gussin*, 9 Haw. App. 279, 288–89, 836 P.2d 498, 504–05 (1991), *rev'd*, 73 Haw. 470, 836 P.2d 484 (1992), remains valid. Marital partner A's during-the-marriage management and maintenance of marital partner A's premarital investment properties are marital partnership activities. Marital partner B's during-the-marriage noninvolvement in the management and maintenance of marital partner A's premarital investment property is no more a relevant and valid factual consideration for

reducing marital partner B's Partnership Model share than marital partner B's preparing all of marital partner A's meals or doing all of the housework are relevant and valid factual considerations for increasing marital partner B's Partnership Model share.

██ "[M]arital partnerships are equal partnerships. During a marriage, both partners enjoy the consequences of one partner's successes and both partners suffer the consequences of one partner's failures." *Hatayama v. Hatayama,* 9 Haw.App. 1, 12, 818 P.2d 277, 283 (1991).

"The partnership model is the appropriate law for the family courts to apply when exercising their discretion in the adjudication of property division in divorce proceedings." *Tougas v. Tougas,* 76 Hawai'i 19, 28, 868 P.2d 437, 446 (1994).

> Under general partnership law, "each partner is entitled to be repaid his [or her] contributions to the partnership property, whether made by way of capital or advances." 59A Am.Jur.2d *Partnership* § 476 (1987) (footnotes omitted). Absent a legally permissible and binding partnership agreement to the contrary, "partners share equally in the profits of their partnership, even though they may have contributed unequally to capital or services." *Id.* § 469 (footnotes omitted). Hawaii [Hawai'i] partnership law provides in relevant part as follows:
>
> **Rules determining rights and duties of partners.** The rights and duties of the partners in relation to the partnership shall be determined, subject to any agreement between them, by the following rules:
>
> (a) Each partner shall be repaid the partner's contributions, whether by way of capital or advances to the partnership property and share equally in the profits and surplus remaining after all liabilities, including those to partners, are satisfied; and must contribute towards the losses, whether of capital or otherwise, sustained by the partnership according to the partner's share of the profits.

*Gardner v. Gardner,* 8 Haw.App. 461, 464, 810 P.2d 239, 242 (1991) (quoting HRS § 425–118(a) (1985)) (quoted in *Tougas v. Tougas,* 76 Hawai'i 19, 27–28, 868 P.2d 437, 445–446 (1994)).

The Hawai'i Supreme Court's Partnership Model applies partnership principles of law and HRS § 580–47. Under the Partnership Model, if all relevant and valid considerations are equal, the division of the Category 5 NMV of the Kai Nani Place and the Category 1 NMVs of the Kekoa Place and Ala Wai Boulevard properties was not an abuse of discretion, but the division of the Category 2 NMVs of the Kekoa Place and Ala Wai Boulevard properties and the Category 5 NMV of the Aoloa Place properties was an abuse of discretion. Therefore, the dispositive question on appeal is whether there is evidence of one or more relevant and valid considerations that were not equal that authorized the deviation from the Partnership Model.

██ The record clearly shows that the family court's reasons for awarding Wife all of the Category 2 and 5 NMVs of the Kekoa Place, Ala Wai Boulevard, and Aoloa Place properties were that (1) the applicable Uniform Starting Point for Category 2 NMVs was seventy-five percent to the owner and twenty-five percent to the non-owner, (2) Husband and Wife each handled much of their finances and many of their properties without involvement by the other spouse, and (3) Husband was not involved with the properties Wife brought into the marital partnership other than by the fact of the marital partnership.

Reason (1) is now not the law. Under the Partnership Model, if all relevant and valid considerations are equal, Category 2 NMVs should be equally divided.

██ Reasons (2) and (3) are not relevant and valid considerations. As we have noted above, except as modified by one or more valid and enforceable premarital agreements, marital agreements, and/or divorce agreements, the Partnership Model applies. In the Epps' case, the parties did not enter into any relevant valid and enforceable premarital agreement. Thus, on the DOM, all of Husband's and Wife's Premarital Separate Property became Marital Partnership Property governed by the Partnership Model.

The parties did not enter into any valid and enforceable divorce agreement. Therefore, in the absence of a valid and enforceable marital agreement, the fact that Husband and Wife conducted their real property and financial affairs as if they were not married is not a valid basis for deviating from the Partnership Model because they were married.

*Au–Hoy v. Au–Hoy*, 60 Haw. 354, 590 P.2d 80 (1979), is not authority to the contrary. In *Au–Hoy*, the Hawai'i Supreme Court did not quarrel with the family court's statement that

> Where the parties, throughout their marriage, have treated their earnings separately, maintained separate expenses and accumulated separate estates, it is within the discretion of the Court to allow each to keep his or her separate estate where such award is fair and equitable under all circumstances. The Court is not compelled to order the sale of all properties and divide the proceeds.

*Id.* at 358, 590 P.2d at 83.

In *Au–Hoy*, the primary dispute was over the following real properties:

| LOCATION | TITLE | CATEGORY |
|---|---|---|
| Kona | Wife | Wife's 3 |
| Pūpūkea Lot 55 | Husband | 5 |
| Pūpūkea Lot 58 | Husband | 5 |
| Pūpūkea Lot 57 | Joint | 5 |

The parties were married for thirty years. "Each paid for his or her separate needs during the marriage, except that the husband paid the costs of food and utility after they moved to Pupukea [Pūpūkea], Oahu [O'ahu], in 1964." *Id.* at 355, 590 P.2d at 81. They lived together on Pupukea [Pūpūkea] Lot 57. The husband wanted Pupukea [Pūpūkea] Lots 55, 58, and 57 awarded to him and the Kona property awarded to the wife. In the alternative, he wanted the family court to "admix all properties and create a Solomonic judgment." *Id.* at 356, 590 P.2d at 82. In other words, he alternatively requested the family court to award him half of all four properties, including the Kona property, thinking that his threat of invading the title to the Kona property would motivate the wife to agree to let him have the three Pupukea properties.

The family court awarded Pūpūkea Lots 55 and 58 to the husband, the Kona property to the wife, and Pūpūkea Lot 57 to the husband and the wife as tenants-in-common, subject to the wife's life interest.

The Partnership Model pertains to NMVs. The issue on appeal in *Au–Hoy* had nothing to do with NMVs. *Au–Hoy* does not mention the subject of NMVs. The issue was the extent of the family court's discretionary authority to award each property to one or the other of the divorcing partners rather than awarding each divorcing partner one-half of all properties. The family court resolved the issue by concluding that "[t]he Court is not compelled to order the sale of all properties and divide the proceeds." *Id.* at 358, 590 P.2d at 83.

Our statement in *Reese v. Reese*, 7 Haw.App. 163, 747 P.2d 703 (1987), *rev'd in part, Lewis v. Lewis*, 69 Haw. 497, 748 P.2d 1362 (1988), that "[t]he family court permissibly considered this course of dealing between the parties when dividing the property of the parties in this case[, s ]ee *Au Hoy v. Au Hoy*, 60 Haw. 354, 590 P.2d 80 (1979)[,]" *Reese*, 7 Haw.App. at 170, 747 P.2d at 708, was not intended to suggest that the marital partners' pattern or practice of conducting some or all of their property and financial affairs as if they were not marital partners is a basis for deviating from the Partnership Model or its predecessor.

In her answering brief, Wife contends that "[i]f the partnership extends to [Wife's] separate property, then it must extend to [Husband's] separate property, in particular his military retirement interest. [Husband] clearly wouldn't agree with that and therein lies the illogical premise of his argument." Contrary to Wife's assertion, except as provided otherwise in one or more valid and enforceable premarital agreements, marital agreements, and/or divorce agreements, the marital partnership also extended to Husband's military retirement benefit. Husband's military retirement benefit has a Category 1 NMV. It may or may not have a Category 2 NMV. The reason we do not need to know these two NMVs, however, is the fact that, because of their unique charac-

teristics, retirement interests are governed by the special rules outlined in *Stouffer v. Stouffer*, 10 Haw.App. 267, 867 P.2d 226 (1994).

■ In Wife's view, the fact that her Category 1 NMVs were direct vital contributions to the acquisition of the Kai Nani Place NMV is a relevant and valid consideration for awarding her more than fifty percent of the Kai Nani Place Category 5 NMV. We disagree. Similarly, the fact that Husband's Category 1 NMVs, including his military disability/retirement benefit, were direct and indirect vital contributions to the acquisition of the Kai Nani Place NMV is also not a relevant and valid consideration. The legal principle that unequal contributions by the partners to an equal partnership do not change the equality of the partnership applies to unequal contributions at the start of the marital partnership and to unequal contributions during the marital partnership.

Under the Partnership Model, if all valid and relevant considerations are equal, Wife's Category 1 NMVs of the Palailai Street, Olaloa Street, and Puahao Place properties should be awarded to Wife and Husband's Category 1 NMV of the Kūmakani Place property should be awarded to Husband. Although there is no precise evidence of the Category 1 NMVs of these properties, the facts permit a finding. From the sale of the Palailai, Olaloa, and Puahao properties, Wife received cash proceeds of approximately $220,162. From the sale of the Kūmakani property, Husband received cash proceeds of $125,000. The facts permit the family court to find, and we assume, for purposes of this opinion, that these amounts are the relevant Category 1 NMVs.

The August 30, 1991 Divorce Decree awarded Wife a total NMV of $1,508,054[4] and awarded Husband a total NMV of $1,043,350.[5] Under the Partnership Model,[6] if all relevant and valid considerations are equal, Wife should be awarded a NMV of $1,343,708[7] and Husband should be awarded a total NMV of $1,207,696.[8] The question is whether there is anything on the record that is a relevant and valid consideration for awarding Wife $164,346[9] more than the Partnership Model.

The following are relevant and valid considerations. Wife entered the marriage in 1978 at age forty-three with real property that had a NMV of $261,012.[10] Not included in this total is the residential property she brought into the marriage but which during the marriage she gifted to her daughter by a prior marriage. Husband entered the marriage at age fifty-eight with real property that had a NMV of $125,000 and with military disability/retirement cash benefits of approximately $2,900 per month, or $34,800 per annum. Under the Partnership Model, Wife would leave the marriage in 1991 at age fifty-five with a NMV of $1,343,708. However, there is evidence that Wife's income is insufficient to support her and that her deficit will increase when the Kai Nani Place residence is sold and she cannot rent two of its bedrooms in her bed and breakfast business. Husband would leave the marriage at age seventy-one with a NMV of $1,297,952 plus Category 1 military disability/retirement cash benefits and social security cash benefits in excess of $5,600 per month, or $67,200 per year.

4. $37,200 + $316,652 + $3,650 + $60,402 + $52,650 + $1,037,500 = $1,508,054.

5. $5,850 + $1,037,500 = $1,043,350.

6. *Gussin v. Gussin*, 73 Haw. 470, 836 P.2d 484 (1992), *rev'd*, 9 Haw.App. 279, 836 P.2d 498 (1991), abolished Uniform Starting Points. *Tougas v. Tougas*, 76 Hawai'i 19, 868 P.2d 437 (1994), approved the Partnership Model. If all relevant and valid considerations are equal, the Partnership Model awards Category 2, 4, and 5 NMVs one-half to each spouse. *Tougas, supra;*

*Hussey v. Hussey*, 77 Hawai'i 202, 881 P.2d 1270 (1994).

7. $220,162 + $37,200 + $158,326 + $3,650 + $30,201 + $29,250 + $864,919 = $1,343,708. $864,919 is one-half of the NMV of the Kai Nani Place property after deducting the Category 1 NMVs.

8. $125,000 + $158,326 + $30,201 + $29,250 + $864,919 = $1,207,696.

9. $1,508,054 − $1,343,708 = $164,346.

10. $220,162 + $37,200 + $3,650 = $261,012.

## CONCLUSION

Accordingly, we (1) vacate (a) parts 5, 6 and 7 of the August 30, 1991 Divorce Decree, and (b) the October 9, 1991 Order, and (2) remand for further proceedings consistent with this opinion.

On remand, the family court shall proceed generally as follows:

1. Decide the Category 1 NMVs of the real estate Husband and Wife brought into the marriage;

2. Categorize the NMVs of the assets and debts of the parties at the time of the divorce;

3. State the application of the Partnership Model to the categorized NMVs of the assets and debts of the parties;

4. Decide whether one or more valid and enforceable marital agreements have modified the Partnership Model in total or in part and/or excluded some or all of the categorized NMVs from the Partnership Model;

5. If the answer to question 4 is yes, state the agreement(s), the modification(s) and/or the exclusion(s), and enforce it or them;

6. Solely with respect to the categorized NMVs that are not within the scope of a valid and enforceable modification of, and/or exclusion from, the Partnership Model, consider the consequences of all valid and enforceable modifications of, and/or exclusions from, the Partnership Model, and decide whether one or more relevant and valid considerations authorize deviation from the Partnership Model;

7. If the answer to question 6 is yes, (a) state each relevant and valid consideration and (b) decide and state the amount of the deviation, if any, from the Partnership Model; and

8. Enter an appropriate decree.

ACOBA, J., concurs in part, dissents in part.

ACOBA, Judge, concurring in part and dissenting in part.

I concur in the remand of this case on the grounds that in determining the division of property, the family court employed a system of "uniform starting points," which was disapproved in *Gussin v. Gussin*, 73 Haw. 470, 836 P.2d 484 (1992).

I would reverse the October 9, 1991 order granting in part Wife's Motion for Reconsideration Filed July 23, 1991 because on the record there is no valid basis for requiring that Wife continue as the beneficiary on the policy insuring Husband's life.

I would not remand for a determination of the applicability of the 1987 amendment to Hawai'i Revised Statutes (HRS) § 572–22, because neither party claimed any contract existed under HRS § 572–22 much less requested the trial court or this court for *enforcement* of contractual remedies.[1] As with

1. It is evident from the briefs that neither party in this dispute argued there was any premarital or marital or post-marital contract under HRS § 572–22 with regard to Husband's survivor's benefit plan (SBP).

The issue was whether Wife's claim for such benefits was appropriately raised.

In his Second Amended Opening Brief, Husband alleged that Wife sought an order that Husband maintain her as the exclusive beneficiary under the SBP only after the divorce trial was completed. On July 30, 1991, the court had initially decided not to divide retirement benefits.

MR. UKISHIMA: I take it—do I assume that you just—the Court is not dividing any of the retirement or IRA pension plans? Each will keep their own.

THE COURT: Each keeps their own.

Wife, on the other hand, asserted that she properly raised a claim to the SBP in paragraph 9 of her February 6, 1991 Position Statement which declared generally that "[e]ach of the parties should be awarded as his or her sole and separate property, the retirement, pension, IRA, profit-sharing and/or other deferred compensation benefits to which he or she is entitled to or to which he or she may become entitled; provided the properties are distributed pursuant to this Position Statement."

Wife's brief also contended that Husband's counsel raised the SBP issue in direct examination of Husband, and cross-examination and re-direct examination of Wife. Whether Wife's claim was timely raised or not, it was raised solely in terms of the division of SBP benefits in conjunction with the division of other assets of the parties, not in terms of a contract which had been breached:

MR. TOMAR [Husband's counsel]: Well, the problem—the reason we submitted an affidavit is because if a new request is coming in which was not made at trial, if it had been made at trial then we would have come in and offered

any other contract, the purported existence and enforcement of any HRS § 572–22 contract are matters to be raised by the party claiming relief thereunder. Nothing in the language of HRS § 572–22 or its legislative history contemplates that pursuant to HRS § 572–22, a court may *sua sponte* impose contractual obligations on a party absent a claim for such relief by the opposing party. With all due respect to the majority, the approach adopted by it conflicts with the legislature's apparent intent to validate agreements which the parties *themselves make and choose to enforce,* not agreements which we may perceive as possibly falling under HRS § 572–22. Many promises or agreements made in the marital context are never meant to be infused with the considerations that characterize ordinary contacts and I see no justification here for casting divorce issues in the mold of HRS § 572–22 where the parties themselves do not. The controversy here is one which arises under HRS § 580–47, not HRS § 572–22.

evidence to rebut the request to keep her as a beneficiary.

It is not in their position statement. It was not in the question. They didn't even ask her in direct whether she wanted it. There were no questions on—on cross-examination. It was not in closing argument. It just wasn't brought up.

If it was—

THE COURT: *I think it was brought up in terms of deviating from the Uniform Starting—*

MR. TOMAR: It was brought up only with respect to an analysis of when they bought the property.

THE COURT: *In her basis also the argument being for deviation.*

*Her position was the deviation on the Uniform Starting Point regarding the marital residence as well as her separately owned property.*

MR. TOMAR: She didn't argue for continued life time benefits, however, as a survivor's annuity in that connection.

THE COURT: No, because her position was I was going to do something other than what I did. (Emphasis added.)