323 P.3d 1216

Colleen P. COLLINS,
Petitioner/Plaintiff–
Appellant,

v.

John A. WASSELL,
Respondent/Defendant–Appellee.

No. SCWC–30070.

Supreme Court of Hawai'i.

Feb. 28, 2014.

**36**

Joy A. San Buenaventura, Hilo, for petitioner.

Andrew S. Iwashita, Hilo, for respondent.

RECKTENWALD, C.J., NAKAYAMA, and McKENNA, JJ., with ACOBA, J., Concurring Separately, and POLLACK, J., Dissenting Separately.

Opinion of the Court by
RECKTENWALD, C.J.

In June 2000, Colleen Collins and John Wassell gathered at a park with their friends, families, and a minister, for the apparent purpose of getting married. After the wedding ceremony, the couple began having second thoughts about the marriage because of its financial implications. Specifically, they believed that Collins and her two daughters would be better able to afford college tuition if Collins was listed as a single parent on financial aid applications. Thus, the couple requested that the minister not submit the completed license and certificate of marriage to the State Department of Health. The minister returned the form to Collins and Wassell, and they subsequently wrote to the State Department of Health stating that they were not getting married.

Following a one-week honeymoon, Collins and Wassell began living together. They each maintained individual financial accounts, but also shared a joint bank account. The couple deposited monetary gifts from their wedding into the joint account and they each agreed to deposit funds into the account. Collins made regular monthly deposits to the joint account. Collins also deposited funds from the sale of her separately owned town-

house and a tax refund into the joint account. Funds from the joint account were used to pay off the mortgage on Wassell's separately owned house, and for the couple's shared utility and grocery bills. The couple legally married in January 2005, after Collins no longer needed financial aid to fund her daughters' college educations.

In 2007, Collins filed for divorce against Wassell, and argued that she was entitled to an equalization payment for her contributions during the period of premarital cohabitation. Wassell, however, maintained that an equalization payment was not warranted because he and Collins had agreed that they would each maintain separate financial identities until the time of their legal marriage. The family court agreed with Wassell and determined that the couple did not form a premarital economic partnership within the meaning of *Helbush v. Helbush*, 108 Hawai'i 508, 122 P.3d 288 (App.2005).[1] The Intermediate Court of Appeals affirmed the divorce decree entered by the family court, and Collins sought review in this court.

For the reasons set forth below, we now affirm the rule set forth in *Helbush*, that, in dividing and distributing property of a married couple pursuant to Hawai'i Revised Statutes (HRS) section 580–47, premarital contributions are a relevant consideration where the parties cohabited and formed a premarital economic partnership. We further hold that the family court clearly erred in concluding that Collins and Wassell did not form a premarital economic partnership. We therefore vacate the judgment of the ICA and the family court's divorce decree and remand to the family court for further proceedings consistent with this opinion. Because our resolution of these two issues is dispositive, we do not consider Collins's arguments that: (1) in the absence of a premarital economic partnership the family court should have nevertheless considered her premarital contributions; and (2) premarital contributions are a valid and relevant consideration warranting deviation from partnership principles.

---

1. As discussed further infra, the Intermediate Court of Appeals determined in *Helbush* that "a 'premarital economic partnership' occurs when, prior to their subsequent marriage, [two people] cohabit and apply their financial resources as

well as their individual energies and efforts to and for the benefit of each other's person, assets, and liabilities." 108 Hawai'i at 515, 122 P.3d at 295.

## I. Background

The following factual background is taken from the record on appeal.

### A. Family Court Proceedings

On August 8, 2007, Collins filed a complaint for divorce against Wassell, alleging that their marriage was irretrievably broken. In her position statement, Collins stated that she should be awarded an equalization payment for her contributions during the couple's premarital cohabitation:

Cohabitation occurred on June 18, 2000 when [Wassell] moved into [Collins's townhouse]. [Wassell] did not pay [Collins's] mortgage at that time although he was receiving rent from his house. From the time of cohabitation until the date of marriage, the parties had a joint financial relationship where [Collins] paid off the mortgage in the marital house, previously owned by [Wassell] and continued to pay into the joint account from where joint bills were paid. Although[ ] marriage did not occur until 2005 <u>equalization is due [Collins] for the amount of: $74,122.00.</u> [Collins] is further entitled to her prorata rental equity due to [Wassell's] sole use of the marital home during separation.

(Emphasis added).

After Wassell filed an answer, he filed a motion for partial summary judgment, requesting that the family court determine the following: (1) the couple was married on January 19, 2005; (2) the couple agreed after their wedding ceremony on June 19, 2000, that they would not file their marriage license and would not be married; (3) the purpose of the couple not filing their marriage license was to allow Collins to complete financial aid forms as a single parent; and (4) the couple's "arrangement, whereby the partners would cohabitate but keep their finances separate while maintaining their single status ... in lieu of a traditional marriage indefinitely and expressly for [Collins's] personal financial interest" was a valid and enforceable premarital agreement.

Collins filed an opposition to Wassell's motion arguing that pursuant to the ICA's decision in *Helbush,* she and Wassell had formed a premarital economic partnership after their 2000 wedding ceremony. The family court granted the motion in part, determining that Wassell's and Collins's date of marriage (DOM) was January 19, 2005, but denied the motion as to the remaining issues.

Wassell argued in his position statement the following:

[Collins] argues for deviation from the Partnership Model division based upon DOM [ (]January 19, 2005) valuations. [Collins's] argument is based upon a June 18, 2000 marriage ceremony which she put on for show. Although [Wassell] thought that the marriage was taking place, at the post-ceremony reception [Collins] told [Wassell] that she did not want the marriage for financial reasons. [Collins's] daughters were about to attend prestigious colleges[.] ... [Collins] would need financial aid to pay for the $30,000 plus annual cost. If [Collins] was married the financial aid available would be less. [Collins] wanted to keep their finances separate so she could complete the financial aid forms showing her separate individual income and expenses. [Wassell] agreed not to be married on June 18, 2000 and to keep their finances separate.

It is [Wassell's] position that there was no joint financial relationship from June 18, 2000, as [Collins] contends. It is [Wassell's] position that they loved each other and wanted to live together. When they lived together as gestures of their love they bought each other meals, and shared their living arrangements and helped each other in various ways.

A one-day trial was held on the division of the parties' marital estate. Collins and Wassell were the only two witnesses to testify and they testified in relevant part as follows.

Collins testified that, on June 18, 2000, she and Wassell had a wedding ceremony with their friends, families, and a minister. After the ceremony, the couple signed the marriage license, but neither Collins nor Wassell mailed the marriage license to the State Department of Health because Collins "was afraid that [her] daughters would lose a lot of financial aid that they were receiving for college." Specifically, Collins was concerned that the colleges would consider both her and Wassell's incomes in determining financial

aid awards for her daughters if she were married. Wassell told Collins that he thought her daughters should pay their own way through college. Collins did not believe that it was Wassell's responsibility to help pay for her daughters' college educations.

Collins further testified that, following their honeymoon, for a few weeks the couple moved back and forth between Collins's separately owned townhouse and Wassell's separately owned house. Wassell then moved into Collins's townhouse. Wassell moved all of his furniture into the townhouse, but left some appliances in his house. While the couple was living at the townhouse, Wassell did not pay any part of the mortgage nor did he pay rent to Collins. Collins paid for all of the townhouse's utilities. Collins acknowledged that Wassell may have done small things around the townhouse, but testified that he did not make any major repairs. While Wassell was living in Collins's townhouse, he was able to rent out his house.

Collins testified that, even though they were not legally married between June 2000 and January 2005, she and Wassell conducted their finances as if they were married. Specifically, Collins testified that although she and Wassell agreed to maintain their individual bank accounts, they also agreed to contribute to a joint bank account, which would be used to pay for shared living expenses. The monetary gifts the couple received at their wedding ceremony, totaling $1,120, were deposited into this joint account. Collins regularly deposited between $500 and $700 a month into the joint account. Collins also deposited a personal income tax refund totaling $1,043.60 into the joint account. According to Collins, Wassell made a few contributions to the account.

Collins sold the townhouse in 2001, at which point the couple moved into Wassell's house. The money from the sale of Collins's townhouse, totaling $23,020.74, was deposited into the joint account. On the same day that deposit was made, $4,239.59 from the joint account was used to pay off the mortgage on Wassell's house. Funds from the joint account were also used to pay for the utilities of Wassell's house, the couple's groceries, and gas for Collins's and Wassell's vehicles. Collins and Wassell continuously cohabited until their separation on January 1, 2007.

Collins testified that, as of 2004, all of her friends thought that she was married.

Wassell testified that he made repairs and improvements to Collins's townhouse, such as replacing a water heater, painting, and fixing the plumbing, louvered windows, and an outdoor clothesline. Wassell acknowledged that Collins had paid approximately $4,200 to pay off the mortgage on his house, and testified that, after they were separated in 2007, he offered to repay Collins the money.

With regard to the marriage license that was signed but never submitted to the State Department of Health, Wassell testified that Collins wanted to remain single for purposes of completing the financial aid forms. Wassell further testified that he and Collins therefore agreed to have separate finances. According to Wassell, that agreement lasted until January 19, 2005, when he and Collins were officially married. At that point, Collins no longer needed to submit financial aid applications.

Wassell also testified that he made deposits into the joint account, which was previously held in his name only. Wassell explained that he and Collins set up the joint account so that they could both have access to its money, and so that bills could be paid automatically from the account.

Wassell indicated that he (1) paid Collins $1,000 on April 17, 2001, (2) paid for the propane, internet, and telephone bills with funds from his separate bank account, and (3) paid for food between ninety and ninety-five percent of the time that he and Collins went out to eat.

The family court made the following relevant findings of fact:

### FINDINGS OF FACT

. . . .

16. Ms. Collins believed that if she were to marry Mr. Wassell and disclose financial information reflecting her change in financial status to the two colleges, she would likely be unable to afford the resulting tuition, with the consequence that her daughters would not be able to attend those colleges.

17. In order to avoid that consequence, Ms. Collins and Mr. Wassell agreed that they would not mail their marriage license and certificate to the Department of Health, and that each of them would maintain separate financial identities, so that Ms. Collins could continue to qualify for the financial aid she needed to send her daughters to their schools of choice.

18. Ms. Collins believed that the financial responsibility for sending her daughters to college was hers alone, and that Mr. Wassell did not share in that obligation, and for his part, Mr. Wassell did not believe he was obligated to assist Ms. Collins with the financial burden arising from her daughters' college education.

. . . .

21. Mr. Wassell owned a residence in Hawaiian Paradise Park, and Ms. Collins owned a townhouse in Pacific Heights.

22. For a time, the couple went back and forth between the two residences, then settled on living in Ms. Collins'[s] townhouse.

23. Mr. Wassell's house in Paradise Park was rented out during some portion of the time that the couple lived in Ms. Collins'[s] townhouse.

24. The rent that Mr. Wassell received from the rental of his residence in Hawaiian Paradise Park was not shared with Ms. Collins.

25. Mr. Wassell did not pay rent to Ms. Collins during the period that the couple was living in Ms. Collins'[s] townhouse.

26. Shortly after the apparent marriage in June of 2000, Ms. Collins'[s] name was added to an account that Mr. Wassell had at CU Hawaii FCU, and the account thereafter remained a joint account.

27. The couple agreed that the joint account would be used for household expenses; both were to deposit funds in the account.

28. The couple received wedding gifts and gifts of cash at their apparent wedding in June, 2000; the cash gifts were deposited into the joint credit union account.

29. Following her addition to the joint account, Ms. Collins made regular monthly deposits, typically in the amount of $500.00, into the joint account.

30. Mr. Wassell made few, if any, deposits into the joint account during the years 2000 through 2007.

31. The funds in the joint account were used primarily for household expenses, i.e. food and household utilities.

. . . .

47. On the date of the legal marriage on January 19, 2005, Ms. Collins was owed a debt by Mr. Wassell in the amount of $4,239.59, which had been incurred when Ms. Collins used her funds to pay off the balance of Mr. Wassell's mortgage in December, 2001.

. . . .

67. On the [date of marriage (DOM)], [Collins] was owed a debt with a [net market value (NMV)] of $4,239.59 by [Wassell] (for the mortgage payoff on the HPP property). On the [date of the conclusion of the evidentiary part of trial (DOCOEPOT)], this debt remained unpaid, and thus unchanged in value. The DOM NMV of this debt is [Collins's] Category 1 asset.

. . . .

As relevant here, in its third conclusion of law, the family court stated that "[b]etween the dates of June 18, 2000, and January 19, 2005, the parties did not participate in an 'economic partnership' within the meaning of *Helbush* [ ], and the division of their marital assets by the court must therefore be based upon the date of their legal marriage." In summary, the family court analyzed this issue as follows.

The family court explained that, under *Helbush*, cohabitation alone is insufficient to establish an economic partnership. Specifically, the family court explained that "there must be a commingling of finances, assets, and energies sufficiently comprehensive to

establish a 'partnership.'" The family court stated that "there is no such thing, for these purposes, as a 'partial partnership.'" In this regard, the family court explained that "[p]arties who are emotionally involved with one another and who are cohabiting must inevitably [commingle] their energies and finances to some extent—the exigencies of normal life and collective activity could scarcely allow it to be otherwise." Thus, the family court observed, "some measure of such commingling is to be expected in every instance of cohabitation, and does not by its mere existence rise to the level necessary to establish a *Helbush* 'economic partnership.'"

The family court then evaluated whether Collins and Wassell had "committed their energies and their assets to one another's purposes to the extent necessary to warrant a conclusion that they were engaged in a relationship akin to that found in a business partnership." The family court stated that although Collins and Wassell "quite explicitly commingled a portion of their funds for housekeeping purposes," they also "simultaneously maintained distinct separate financial identities."

The family court explained that the most obvious example of Collins's and Wassell's separate financial identities was the couple's conscious decision not to make their first marriage legal "for the express purpose of maintaining separate financial identities." The family court noted that Collins and Wassell had two motives in agreeing not to be married. First, Collins sought to take full advantage of the financial aid available to her, and, second, Wassell "could refrain from shouldering any share of that not insignificant burden." The family court stated that "[f]ar from reflecting the parties' intention to 'apply their financial resources to and for the benefit of each other's persons, assets, and liabilities,'" these facts reflected "the parties' express intention not to do so." (Citation and ellipsis omitted).

The family court specifically noted that Collins represented in her financial aid applications that she was single, and that Collins and Wassell signed a letter to the State Department of Health representing that they had decided not to be married. The family court further noted that both Collins and Wassell maintained separate individual checking, savings, and retirement accounts, and life insurance policies, and that Collins and Wassell each appeared to hold title to their own vehicle.

With respect to the joint account, the family court observed that Collins was the primary, if not the exclusive, contributor to the account, and that Collins's monthly deposits were "obviously insufficient to pay the living expenses of two adults." The family court concluded that the "joint account no doubt reflected a measure of financial cooperation by the parties, but it seems wholly inadequate to carry the weight of establishing an economic partnership between them."

Based on its findings and conclusions, the family court divided the marital estate and concluded that under a strict application of marital partnership principles, Collins would owe Wassell an equalization payment of $11,807.85. However, because Wassell had wasted assets after the family court's express order to the contrary, the court concluded that Collins was entitled to a deviation in the amount of $17,238.05. Accordingly, the family court ordered Wassell to pay a final equalization payment of $5,430.20, the difference between the deviation and Collins's equalization payment.

The family court filed its divorce decree, and Collins appealed.

### B. ICA Appeal

On appeal, Collins argued that the family court incorrectly valued the parties' financial contributions on the date of marriage.[2] In-

2. Collins challenged Findings of Fact Nos. 17, 18, and 67, which are set forth above, as well as several Findings of Fact (Nos. 68, 70, 71, 73–76, 78–80, and 82) that valued various assets as of the date of marriage. She also challenged Conclusion of Law No. 3, and the family court's decision. The ICA concluded that Findings of Fact 17, 18, and 67 were not clearly erroneous, and that the remaining challenged factual find-

ings were not erroneous because the family court determined that Collins and Wassell had not entered into a premarital economic partnership. The ICA therefore concluded that the date of marriage was the relevant date for valuing Wassell's assets, dividing the couple's assets, and equalizing the parties' obligations. Collins's application does not separately address these findings of fact.

stead, Collins argued, the family court should have concluded that Collins and Wassell formed a premarital economic partnership on the date of their wedding ceremony, and should have calculated the value of the parties' assets and any equalization payments based on that date. Collins asserted that the majority of the family court's findings supported a conclusion that the parties had formed a premarital economic partnership. Collins argued that the family court's finding that the parties initially agreed not to become legally married in order to avoid negative financial aid consequences for Collins's daughters did not void this premarital economic partnership.

A majority of the ICA affirmed the family court's divorce decree. The ICA "decline[d] to overturn" the family court's determination that Collins and Wassell had not formed a premarital economic partnership, noting that the factors the family court cited in support of its decision "were relevant to evaluating the parties' intent and the degree to which they applied their resources and efforts 'to and for the benefit of each other's person, assets, and liabilities.'" In addition, the ICA concluded that the family court's decision was based on factual findings supported by substantial evidence. The ICA further concluded that because no premarital economic partnership was formed, it did not need to address Collins's argument that the family court erred in using the date of marriage in valuing Wassell's assets, dividing the parties' assets, and equalizing the parties' obligations.

In a dissenting opinion, Judge Reifurth stated that the family court erred in failing to utilize the analysis required by *Helbush* in determining that Collins and Wassell had not formed a premarital economic partnership. Judge Reifurth noted that the family court's analysis focused on Collins's and Wassell's attempt to maintain separate "financial identities," which he argued was not solely determinative of whether a premarital economic partnership was formed. Specifically, Judge Reifurth explained that:

> The ultimate issues are whether, and the extent to which, prior to the [date of marriage], the parties applied their financial resources and individual energies for each other's person, assets, and liabilities, not whether, and the extent to which, the par-

ties created joint bank accounts or added both of their names to their cars' titles. Thus, the thrust of the Family Court's inquiry must be to consider the nature and degree of such application, and it must do so adequately.

. . . .

> I would vacate the Family Court's conclusion of law no. 3 [ ] that no premarital economic partnership was formed because the court took into consideration multiple irrelevant factors without considering multiple relevant factors that focus less on the form of the relationship and more on the day-to-day reality of how it worked, when making its decision.

(Footnote omitted).

## II. Standard of Review

### A. Family Court Decisions

■ The family court's [findings of fact] are reviewed on appeal under the "clearly erroneous" standard. A [finding of fact] is clearly erroneous when (1) the record lacks substantial evidence to support the finding, or (2) despite substantial evidence in support of the finding, the appellate court is nonetheless left with a definite and firm conviction that a mistake has been made. "Substantial evidence" is credible evidence which is of sufficient quality and probative value to enable a person of reasonable caution to support a conclusion.

On the other hand, the family court's [conclusions of law] are reviewed on appeal *de novo*, under the right/wrong standard. [Conclusions of law], consequently, are [ ]not binding upon an appellate court and are freely reviewable for their correctness.

*Kakinami v. Kakinami*, 127 Hawai'i 126, 136, 276 P.3d 695, 705 (2012) (citations omitted).

## IV. Discussion

■ In her application, Collins raises the following question: whether the family court misapplied the premarital cohabitation rule set out in *Helbush* in concluding that Collins and Wassell had not entered into a premarital economic partnership. We now affirm the rule set forth in *Helbush,* that, in dividing

and distributing property pursuant to HRS § 580–47, premarital contributions are a relevant consideration where the parties cohabited and formed a premarital economic partnership. We further hold that the family court erred in concluding that Collins and Wassell did not form a premarital economic partnership.[3]

## A. An overview of Hawai'i's property division scheme

In Hawai'i, "[t]here is no fixed rule for determining the amount of property to be awarded each spouse in a divorce action other than as set forth [in] HRS § 580–47." *Kakinami*, 127 Hawai'i at 136–37, 276 P.3d at 705–06 (citing *Tougas v. Tougas*, 76 Hawai'i 19, 26, 868 P.2d 437, 444 (1994)). Under HRS § 580–47, the family court has wide discretion to divide marital property according to what is "just and equitable." *Tougas*, 76 Hawai'i at 26, 868 P.2d at 444 (citing *Gussin v. Gussin*, 73 Haw. 470, 479, 836 P.2d 484, 489 (1992)).

As this court has explained, when the directive of the court is to do what is just and equitable, each case must be decided upon its own facts and circumstances. *Gussin*, 73 Haw. at 479, 836 P.2d at 489 (citing *Carson v. Carson*, 50 Haw. 182, 183, 436 P.2d 7, 9 (1967)). Of course, this discretion is not without limitation. A grant of discretion means that "the court has a range of choice, and that its decision will not be disturbed as long as it stays within that range and is not influenced by any mistake of law." *Gussin*, 73 Haw. at 479, 836 P.2d at 489 (internal quotation marks and citation omitted). "To the extent that a certain degree of uniformity, stability, clarity or predictability of family court decisions can be attained, while at the same time preserving the wide discretion mandated by HRS § 580–47, judges are compelled to apply the appropriate law to the facts of each case and be guided by reason and conscience to attain a just result." *Id.* at

486, 836 P.2d at 492 (internal quotation marks omitted).

Consistent with the wide discretion bestowed on the family court, HRS § 580–47 provides that upon granting a divorce, the family court may "make any further orders as shall appear just and equitable ... finally dividing and distributing the estate of the parties, real, personal, or mixed, whether community, joint, or separate[.]" HRS § 580–47(a). Section 580–47 further provides that in making these orders, the family court shall consider the respective merits of the parties, the relative abilities of the parties, the condition in which each party will be left by the divorce, the burdens imposed upon either party for the benefit of the children of the parties, the concealment of or failure to disclose income or an asset, any violation of a restraining order by either party, and all other circumstances of the case. HRS § 580–47(a).

Cases in this jurisdiction have "created a framework based on partnership principles that provides further guidance for family courts to use in dividing property upon divorce." *Kakinami*, 127 Hawai'i at 137, 276 P.3d at 706. In *Gussin*, this court rejected the notion that the division and distribution of the estates of parties must commence at uniform starting points. 73 Haw. at 486, 836 P.2d at 492. This court held that the concept of uniform starting points "restrict[ed] the family courts' discretion in the equitable division and distribution of parties' estates." *Id.* The court specifically rejected the ICA's "rebuttable presumptions" that bound a judge to presume specific percentage splits in the division of each category of property. *Id.* at 481, 836 P.2d at 490. This court instead determined that "the 'partnership model of marriage' provides the necessary guidance to the family courts in exercising their discretion and to facilitate appellate review." *Id.*

---

3. In her application, Collins also raises two additional questions: (1) whether the rule set forth in *Helbush* precludes the family court from considering premarital contributions in the absence of a premarital economic partnership; and (2) assuming that the parties did not enter into a premarital economic partnership, did the ICA gravely err in not considering whether Collins's

premarital contributions were a valid and relevant consideration warranting deviation from the marital partnership categories. Insomuch as we conclude that the family court erred in finding that Collins and Wassell did not form a premarital economic partnership, we do not consider these additional arguments.

at 486, 836 P.2d at 492. Specifically, the court noted:

> This court has accepted the "time honored proposition that marriage is a partnership to which both partners bring their financial resources as well as their individual energies and efforts." The ICA has also acknowledged that, in divorce proceedings regarding division and distribution of the parties' estate, "partnership principles guide and limit the range of the family court's choices."
>
> Under general partnership law, "each partner is entitled to be repaid his contributions to the partnership property, whether made by way of capital or advances." Absent a legally permissible and binding partnership agreement to the contrary, "partners share equally in the profits of their partnership, even though they may have contributed unequally to capital or services." Hawaii partnership law provides in relevant part as follows:
>
> Rules determining rights and duties of partners. The rights and duties of the partners in relation to the partnership shall be determined, subject to any agreement between them, by the following rules:
>
> (a) Each partner shall be repaid the partner's contributions, whether by way of capital or advances to the partnership property and share equally in the profits and surplus remaining after all liabilities, including those to partners, are satisfied; and must contribute towards the losses, whether of capital or otherwise, sustained by the partnership according to the partner's share in the profits.

*Id.* at 483–84, 836 P.2d at 491 (citations omitted).

In *Tougas,* this court again endorsed the "partnership model" and noted that the family court can utilize the following five categories of net market values as guidance in divorce cases:

> Category 1. The net market value (NMV), plus or minus, of all property separately owned by one spouse on the date of marriage (DOM) but excluding the NMV attributable to property that is subsequently legally gifted by the owner to the other spouse, to both spouses, or to a third party.

> Category 2. The increase in the NMV of all property whose NMV on the DOM is included in category 1 and that the owner separately owns continuously from the DOM to the DOCOEPOT [date of the conclusion of the evidentiary part of the trial].

> Category 3. The date-of-acquisition NMV, plus or minus, of property separately acquired by gift or inheritance during the marriage but excluding the NMV attributable to property that is subsequently legally gifted by the owner to the other spouse, to both spouses, or to a third party.

> Category 4. The increase in the NMV of all property whose NMV on the date of acquisition during the marriage is included in category 3 and that the owner separately owns continuously from the date of acquisition to the DOCOEPOT.

> Category 5. The difference between the NMVs, plus or minus, of all property owned by one or both of the spouses on the DOCOEPOT minus the NMVs, plus or minus, includable in categories 1, 2, 3, and 4.

76 Hawaiʻi at 27, 868 P.2d at 445 (citation omitted).

 The court in *Tougas* further noted that the NMVs in Categories 1 and 3 are the parties' "capital contributions" that are, pursuant to general partnership law, returned to each spouse. *Id.* (citations omitted). Categories 2 and 4 are the "during-the-marriage increase in NMVs of the Categories 1 and 3 Properties owned at DOCOEPOT[,]" which similar to partnership profits, are generally to be shared equally. *Id.* Thus, these cases establish that the "partnership model is the appropriate law for the family courts to apply when exercising their discretion in the adjudication of property division in divorce proceedings." *Id.* at 28, 868 P.2d at 446.

## B. Premarital contributions are a relevant consideration in dividing the marital estate

 This case presents an issue of first impression for this court, i.e., whether premarital contributions made during a period of cohabitation are a relevant consideration in dividing property pursuant to HRS § 580–47. A long line of ICA cases has concluded

that premarital contributions are relevant in dividing the marital estate. For the reasons set forth below, we also hold that premarital contributions may be considered by the family court in dividing the martial estate when the parties entered into a premarital economic partnership and cohabited prior to marriage.

The proposition that parties may enter into an economic partnership prior to marriage first appears to have been recognized in *Raupp v. Raupp*, 3 Haw.App. 602, 609 n.7, 658 P.2d 329, 335 n.7 (1983). In *Raupp*, the ICA noted that "[w]here the parties first commenced an economic partnership and later married, it may be appropriate to obtain [an itemized description and value of all property owned by each party] as of the time they commenced their economic partnership," in dividing the martial estate upon divorce. *Id.; see also Higashi v. Higashi*, 106 Hawai'i 228, 241, 103 P.3d 388, 401 (App. 2004) (noting that the economic partnership begins on the earlier of the date of marriage or the date the parties first commenced their economic partnership that continued when they married). *Raupp* and *Higashi* therefore stand for the general proposition that premarital circumstances may be relevant in distributing property upon divorce if the couple formed an economic partnership prior to marriage.

In *Malek v. Malek*, 7 Haw.App. 377, 379, 768 P.2d 243, 246 (1989), the ICA held that the family court properly considered contributions made by one spouse to the other spouse's separate property during the couple's premarital cohabitation and subsequent marriage. In *Malek*, the only major asset involved in the divorce was the husband's lease of a two-acre parcel of land with a house on it. *Id.* at 378, 768 P.2d at 246. During a sixteen-month period of premarital cohabitation, the couple lived together on this property. *Id.* at 379, 768 P.2d at 245. Although the husband provided all of the financial support for the couple, and the wife was unemployed, the wife assisted in upgrading the house. *Id.* at 379, 768 P.2d at 246. The family court valued the husband's lease at $92,000 when the couple began living together, $113,000 when the couple married, and $115,000 when the couple separated in contemplation of divorce. *Id.* at 378, 768 P.2d at

245. As part of its property division, the family court awarded the wife five percent (i.e., $6,650) of the property's value on the date of marriage. *Id.*

On appeal, the husband argued that the family court could not consider anything that happened before the couple was legally married in distributing property pursuant to HRS § 580–47. *Id.* at 380, 768 P.2d at 246. The ICA rejected this argument, concluding that the "family court's discretion when dividing and distributing property and debts in divorce cases is not so restricted." *Id.* The ICA held that "[w]hen the parties thereafter divorced, the family court, in the exercise of its duty to divide and distribute property in divorce cases, allowably considered their respective contributions to [the] separate property during both their premarital cohabitation and subsequent marriage." *Id.; see also Hussey v. Hussey*, 77 Hawai'i 202, 206, 881 P.2d 1270, 1274 (App.1994) (defining premarital separate property as "property owned by each spouse immediately prior to their marriage <u>or cohabitation that was concluded by their marriage</u>") (emphasis added), *overruled on other grounds by State v. Gonsales*, 91 Hawai'i 446, 984 P.2d 1272 (App.1999). Thus, pursuant to *Malek*, in making an equitable distribution of property pursuant to HRS § 580–47, the family court may consider contributions made to specific assets during a period of premarital cohabitation. 7 Haw.App. at 379–80, 768 P.2d at 246.

Relying on *Malek*, 7 Haw.App. at 380, 768 P.2d at 246, the *Helbush* court concluded that where premarital cohabitation matures into marriage, the family court is generally allowed to consider the respective contributions of each spouse during both the premarital economic partnership and subsequent marriage in dividing and distributing property pursuant to a divorce. 108 Hawai'i at 515, 122 P.3d at 295. The *Helbush* court explained that "a 'premarital economic partnership' occurs when, prior to their subsequent marriage, [two people] cohabit and apply their financial resources as well as their individual energies and efforts to and for the benefit of each other's person, assets, and liabilities." *Id.* The *Helbush* court therefore concluded that the family court is allowed to consider premarital contributions of each

spouse in dividing the marital estate when the couple formed an economic partnership and lived together prior to marriage.[4]

We now affirm the holding of *Helbush* that premarital contributions are a relevant consideration when the parties entered into a premarital economic partnership during a period of cohabitation. *See Helbush*, 108 Hawai'i at 514–15, 122 P.3d at 294–95.

 Our conclusion in this regard is consistent with HRS § 580–47 and our adoption of partnership principles, which, as noted above, provide guidance for family courts in dividing property upon divorce. The family court is vested with wide discretion in "finally dividing and distributing the estate of the parties, real, personal, or mixed, whether community, joint, or separate." HRS § 580–47(a). In making a division and distribution of property, HRS § 580–47(a) identifies certain enumerated factors which the family court shall consider, including the respective merits of the parties, the relative abilities of the parties, the condition in which each party will be left by the divorce, and "all other circumstances of the case." HRS § 580–47(a) (emphasis added). Contributions made by either spouse after the couple entered into a premarital economic partnership are therefore included within "all [the] other circumstances of the case" which the family court is required to consider in determining an equitable distribution of the marital estate.[5] HRS § 580–47(a).

### C. The family court erred in determining that a premarital economic partnership was not formed

 The family court determined that Collins and Wassell did not form a premarital economic partnership because they maintained "distinct separate financial identities," and were therefore not "engaged in a relationship akin to that found in a business partnership." Collins argues that, in evaluating whether she and Wassell entered into a premarital economic partnership, the family court did not adequately consider the nature and degree to which she and Wassell applied their resources, energies, and efforts for each other's benefit, and that the family court relied on irrelevant factors, such as the parties' admitted use of separate financial accounts, Collins's filing financial aid applications as a single parent, and the parties' letter to the Department of Health stating their intention not to be legally married. For the reasons set forth below, the family court erred in determining that Collins and Wassell did not enter into a premarital economic partnership.

 As stated above, a premarital economic partnership is formed when, "prior to their subsequent marriage, [two people] cohabit and apply their financial resources as well as their individual energies to and for the benefit of each other's person, assets, and liabilities." *Helbush*, 108 Hawai'i at 515, 122 P.3d at 295. Whether a premarital economic partnership has been formed depends upon the intention of the parties. *See, e.g., Stanford Carr Dev. Corp. v. Unity House, Inc.*, 111 Hawai'i 286, 302, 141 P.3d 459, 475 (2006) ("[W]hether an agreement creates a partnership or not depends upon the intention of the parties." (Brackets in original and citation omitted)). Absent an express agreement, in evaluating whether the parties intended to form a premarital economic part-

---

4. To be clear, the rule set forth in *Helbush* applies only to situations in which a relationship ultimately culminates in marriage, and does not address circumstances where cohabitation does not result in marriage. *See Maria v. Freitas*, 73 Haw. 266, 274, 832 P.2d 259, 264 (1992) (holding that "[a] person who is not legally married does not qualify for the positive legal consequences of marriage" (citation omitted)).

5. The dissent argues that applying the test set forth above "may lead to challenges of otherwise valid prenuptial agreements." Dissenting opinion at 56, 323 P.3d at 1238. As the dissent points out, however, Collins and Wassell did not enter into a premarital agreement. Dissenting opinion at 56–57, 323 P.3d at 1238–39. Moreover, where a couple has formed a premarital economic partnership, they are fully able to control the disposition of property acquired during the premarital period by executing a valid premarital or postmarital agreement. *See* HRS § 572D–3 (2006) ("Parties to a premarital agreement may contract with respect to … [t]he rights and obligations of each of the parties in any of the property of either or both of them whenever and wherever acquired or located[.]"); HRS § 572–22 (2006) ("All contracts made between spouses … not otherwise invalid because of any other law, shall be valid."). A valid premarital or postmarital agreement must be en-

nership, the family court must consider the totality of the circumstances, including both the economic and non-economic contributions of the parties. *See Cassiday v. Cassiday*, 68 Haw. 383, 387, 716 P.2d 1133, 1136 (1986) ("[M]arriage is a partnership to which both partners bring their financial resources as well as their individual energies and efforts."); *see also LeMere v. LeMere*, 262 Wis.2d 426, 663 N.W.2d 789, 797 (2003) (noting that marriage is "an equal partnership, in which the contributions of the spouse who is primarily engaged in child-rearing and home-making are presumptively valued equally with those of the income-earning spouse"). In making this determination, relevant considerations may include, but are not limited to, joint acts of a financial nature, the duration of cohabitation, whether—and the extent to which—finances were commingled, economic and non-economic contributions to the household for the couple's mutual benefit, and how the couple treated finances before and after marriage.[6] *See, e.g., In re Marriage of Clark*, 316 Mont. 327, 71 P.3d 1228, 1230 (2003) (concluding that trial court did not err in considering premarital contributions where one spouse made improvements to the home and surrounding property of the other spouse); *Floyd v. Floyd*, 17 Va.App. 222, 436 S.E.2d 457, 459 (1993) ("[A] trial court may properly consider the parties' premarital contributions, both monetary and nonmonetary, insofar as those contributions affected the value of the marital property but that cohabitation alone—absent a showing of its impact on marital property values—is not an appropriate consideration."); *Wall v. Moore*, 167 Vt. 580, 704 A.2d 775, 777 (1997) (affirming the family court's determination that it could consider the non-monetary and monetary contributions of the parties during their 11–year premarital relationship when dividing the couple's assets upon divorce); *Hendricks v. Hendricks*, 784 N.E.2d 1024, 1028 (Ind.Ct.App.2003) (concluding that trial court did not abuse its discretion in considering premarital contributions where spouse worked part-time, paid rent on couple's

home, and started business with other spouse).

ICA cases applying the rule enunciated in *Helbush* have therefore properly focused on both the financial and nonfinancial aspects of the parties' premarital relationship. *See, e.g., Chen v. Hoeflinger*, 127 Hawaiʻi 346, 279 P.3d 11 (App.2012); *Aiona–Agra v. Agra*, No. 30685, 2012 WL 593105 (App. Feb. 23, 2012) (SDO); *Doe v. Roe*, No. 28596, 2010 WL 2535138 (App. June 23, 2010) (mem. op.); *Gordon v. Gordon*, Nos. CAAP–12–0000806, CAAP–12–0001096, 2013 WL 6231721 (App. Nov. 29, 2013) (mem. op.) (upholding family court's determination that a couple entered into a premarital economic partnership by jointly contributing capital and labor to real estate investments, and living in a relationship which culminated in marriage).

For example, in *Chen*, Hui Z. Chen married Thomas J. Hoeflinger in 1995. 127 Hawaiʻi at 350, 352, 279 P.3d at 15, 17. Chen began living with Hoeflinger in 1992. *Id.* at 352, 279 P.3d at 17. The family court concluded that the couple entered into a premarital economic partnership when Chen "was employed at a hospital and she utilized her income to pay for the household expenses such as food and supplies to which [Hoeflinger] also contributed when [Chen's] income was insufficient." *Id.* at 359, 279 P.3d at 24 (brackets in original). The family court further noted that Chen and Hoeflinger also enjoyed "all of the conjugal benefits as if they were husband and wife." *Id.* On appeal, Hoeflinger contended that the family court erred in finding that he and Chen formed a premarital economic partnership. *Id.* at 358, 279 P.3d at 23. Specifically, Hoeflinger argued that there was no premarital economic partnership because Chen did not contribute to or enhance the parties' assets. *Id.* at 359 n.11, 279 P.3d at 24 n.11. The ICA rejected these arguments, noting that "[w]hen Chen paid for food and supplies for the benefit of Hoeflinger, it enhanced and supported Hoeflinger." *Id.*

In *Aiona–Agra*, the family court also determined that Heather Aiona–Agra (Wife)

---

forced by the family court. *See Epp v. Epp*, 80 Hawaiʻi 79, 86, 905 P.2d 54, 61 (App.1995).

**6.** The dissent argues that this test is "nearly unlimited" and provides "no guidance" to the family court. Dissenting opinion at 55, 323 P.3d

at 1237. Respectfully, the test to be used in evaluating whether a premarital economic partnership has been formed must be flexible in order to accommodate the range of factual circumstances presented to the family court.

and Jayson Javier Agra (Husband) formed a premarital economic partnership. 2012 WL 593105, at *3. On appeal, Husband argued that the record "fail[ed] to evidence a single 'financial resource' from [Wife] prior to their marriage[.]" *Id.* The ICA rejected this argument and concluded that Husband's position "ignore[d] the fact that the partnership model considers more than just monetary contributions to the partnership." *Id.* The ICA determined that "the unchallenged findings of fact establish that Wife contributed some 'individual energies and efforts' to the construction of the home and Husband lived rent-free with Wife and with Wife's family, as a direct benefit of his relationship with Wife." *Id.* Accordingly, the ICA concluded that the family court did not err in finding that Husband and Wife had formed a premarital economic partnership.[7] *Id.*

▇▇ In sum, these cases properly recognize that the family court, in determining whether a premarital economic partnership was entered into, must consider both the financial and nonfinancial contributions of the parties during the premarital relationship.

Here, the undisputed facts establish that Collins and Wassell formed a premarital economic partnership in 2000. In this regard, it is undisputed that following the wedding ceremony in 2000, the couple began living together. The couple continued to live together until they were legally married in 2005. Collins testified that, as of 2004, all of her friends thought that she was married. During this time, Collins and Wassell applied "their financial resources as well as their energies and efforts to and for the benefit of each other's person, assets, and liabilities." *Helbush*, 108 Hawai'i at 515, 122 P.3d at 295.

Specifically, upon returning from their honeymoon, the couple first lived in Collins's townhouse. Collins thereby applied her resources to the partnership by allowing Wassell to live in her townhouse rent-free. *See Aiona–Agra*, 2012 WL 593105, at *3 (noting that it was relevant to the inquiry as to whether a premarital economic partnership was formed that one spouse lived rent-free with the other spouse's family). Wassell, in turn, applied his energies and efforts to and for the benefit of the partnership by helping to make improvements to the townhouse, including installing a new water heater, painting some rooms, and making other small repairs. In addition to receiving the benefit of living in Collins's townhouse rent-free, Wassell further benefitted from Collins's contributions because he was able to rent out his separately owned house.

The parties' utilization of the joint bank account further demonstrates the existence of a premarital economic partnership. Wassell created the joint account by adding Collins's name to what had been his separate account. Following the 2000 wedding ceremony, the couple deposited cash gifts totaling more than $1,100 into the joint account. Collins also deposited proceeds from the sale of her townhouse totaling more than $23,000 into the joint account, and later deposited a tax refund of more than $1,000 into the account. The couple agreed that they would each deposit funds into the account, and that the funds would be used for household expenses. Collins made regular monthly deposits to the account, and the funds were used to pay off the mortgage on Wassell's house, and to pay for household expenses, including groceries and household utilities.[8]

---

7. In contrast, in *Doe*, 2010 WL 2535138, at *7, the ICA affirmed the family court's determination that no premarital economic partnership was formed. There, the couple had cohabited for approximately one year before they married. *Id.* at *1. Two days prior to their date of marriage, the husband purchased property in Kamuela. *Id.* at *7. Upon divorce, the family court awarded the husband a capital contribution credit for the property. *Id.* at *1. The family court concluded that "[s]imply cohabitating together does not automatically transform a relationship into a premarital economic partnership[.]" *Id.* at *7. The family court further made unchallenged findings that there was no credible evidence that the wife had contributed financially

toward the purchase of the property, had worked to enhance its value prior to the date of marriage, or had participated in its upkeep prior to the date of marriage. *Id.* The ICA therefore affirmed the family court's determination and noted that there was "no clear error in the family court's ruling." *Id.*

8. The dissent argues that we place "undue reliance" on the joint bank account. Dissenting opinion at 55, 323 P.3d at 1237. As explained above, in addition to the joint account, the manner in which Collins and Wassell handled their real property and covered their mutual expenses further demonstrated that they had formed a premarital economic partnership. Moreover, in

*See Chen,* 127 Hawai'i at 352, 359, 279 P.3d at 17, 24 (noting that a premarital economic partnership was formed when one spouse purchased food and supplies for the benefit of the other spouse during their premarital cohabitation).

To the extent the family court noted that Collins's monthly contribution into the joint account was insufficient to cover the parties' monthly expenses, the family court failed to recognize that the remainder of Collins's and Wassell's joint living expenses were presumably covered by one or both of the parties. Indeed, in addition to using funds from the joint account to pay for groceries and the utilities for Wassell's house, evidence offered at trial indicated that Wassell occasionally bought groceries, and that, when the couple ate out, Wassell paid the bill between ninety and ninety-five percent of the time.

After nearly five years of living together, the couple legally married. Notably, nothing appears to have materially changed in the couple's day-to-day relationship or how they managed their financial affairs. Indeed, Collins expressly testified that she and Wassell maintained separate bank accounts both before and after their legal marriage in 2005. It therefore appears that, even after they were legally married, the couple cohabited in Wassell's house and continued to use the joint account as they had during their premarital relationship, i.e., as a common fund into which both made deposits and from which withdrawals were made to pay for communal expenses. Because Collins and Wassell applied "their financial resources as well as their energies and efforts to and for the benefit of each other's person, assets, and liabilities," *Helbush,* 108 Hawai'i at 515, 122 P.3d at 295, the family court erred in determining that Collins and Wassell had not entered into a premarital economic partnership.

The family court further erred in relying on its finding that Collins and Wassell "maintained distinct separate financial identities." Specifically, the family court noted that the couple maintained separate checking and savings accounts. However, the fact that Collins and Wassell each maintained separate

financial accounts does not, in and of itself, support the family court's ultimate determination that no premarital economic partnership was formed. *See, e.g., Epp,* 80 Hawai'i at 93, 905 P.2d at 68 (noting that marital partners' pattern or practice of conducting some or all of their property and financial affairs as if they were not marital partners is not a basis for deviating from the partnership model). In focusing on "separate financial identities," the family court failed to address whether the parties' individual financial accounts were used to pay collective expenses. Put another way, the holding of funds in separate accounts is not dispositive when the parties' respective financial resources, energies, and efforts are otherwise applied for each other's mutual benefit. *See Helbush,* 108 Hawai'i at 515, 122 P.3d at 295.

Finally, the family court erroneously focused on Collins's representation on her daughters' financial aid applications that she was single and the letter to the Department of Health signed by Collins and Wassell that indicated that they decided not to be married. Specifically, the family court appeared to suggest that it was inconsistent for Collins to assert that she and Wassell had entered into a premarital economic partnership after she stated on financial aid applications that she was single.

First, it should be noted that Collins's representations on financial aid applications and to the Department of Health that she was unmarried were factually accurate, because Collins and Wassell were not, in fact, married until January 19, 2005. Indeed, it would have been inaccurate for Collins or Wassell to represent to financial aid representatives that they were married. Thus, Collins did not misrepresent her legal status on the financial aid applications and the couple did not misrepresent their legal status in the letter to the Department of Health.

Second, these representations are not necessarily inconsistent with an intent to form a premarital economic partnership. Although Collins and Wassell agreed not to become

---

determining whether a premarital economic partnership has been formed, the relevant inquiry is whether the parties have applied "their financial resources as well as their individual energies and efforts to and for the benefit of each

other's person, assets, and liabilities." *Helbush,* 108 Hawai'i at 515, 122 P.3d at 295. For all the reasons set forth above, that standard was plainly satisfied here.

legally married in 2000, that does not mean that they agreed they would not be economic partners. To the contrary, they immediately began behaving like the legally married couple that they eventually became. Again, the relevant inquiry is whether the parties intended to apply their resources, efforts, and energies for each other's benefit before ultimately marrying. The funding source for Collins's daughters' college tuition is but one aspect of the couple's financial circumstances, and Collins's interest in receiving financial aid as a single parent is not sufficient to override the parties' apparent intent to engage in a premarital economic partnership in all other aspects of their financial lives. Furthermore, it appears that both parties benefitted financially from these representations—Collins was able to send her daughters to the colleges of their choice, and Wassell presumably benefitted from funds that otherwise would have paid for college expenses.

The family court's valuation and division of Wassell's house illustrates why the court's application of the principles set forth in *Helbush* failed to ensure a fair and equitable property distribution in this case. Collins argued that Wassell should be awarded the house, which he separately owned, but that she was entitled to an equalization payment for that property. As noted above, during the period of premarital cohabitation, Wassell lived rent-free in Collins's townhouse, Wassell collected rent from his house, Collins used the proceeds from the sale of her separately owned townhouse to pay off the mortgage on Wassell's house, and the couple eventually cohabited in Wassell's house prior to their legal marriage. According to Collins, the value of the house more than doubled during that period. The family court nevertheless valued the property on the date of marriage and awarded it solely to Wassell. Under the principles set forth above, Wassell's house should have been valued at the time that the premarital economic partnership began. Otherwise, Wassell is allowed to retain all of the appreciation attributable to Collins's and Wassell's joint efforts prior to marriage. *See Helbush*, 108 Hawai'i at 515, 122 P.3d at 295.

While the family court is given broad deference to weigh the evidence and to determine credibility, *see Booth v. Booth*, 90 Hawai'i 413, 417, 978 P.2d 851, 855 (1999) (holding that "the family court assesses and weighs all valid and relevant considerations to exercise its equitable discretion in distributing marital property"), the family court here applied incorrect legal principles when considering the nature and degree to which the parties applied their financial resources, energies, and efforts for each other's benefit. *See Helbush*, 108 Hawai'i at 515, 122 P.3d at 295. Under the circumstances of this case—particularly where the family court relied solely on the parties' financial identities, failed to adequately consider the nature and degree to which the parties applied their financial resources, energies, and efforts for the benefit of each other, and weighed against the parties that they truthfully stated their marital status to third parties—the family court erred in determining that Collins and Wassell did not form a premarital economic partnership.

## V. Conclusion

For the foregoing reasons, we vacate the ICA's judgment, the family court's Conclusion of Law No. 3, Findings of Fact No. 47, 67, 68, 70, 71, 73–76, 78–80, and 82, and the Decision, and the property-division and equalization provisions in the Divorce Decree. We remand to the family court to make a division and distribution of property in light of Collins's and Wassell's premarital economic partnership.

Concurring Opinion by ACOBA, J.

The circumstances of this case seem straightforward and not to require complex analysis—that for financial reasons the parties simply postponed the formal legal ties of marriage until the children of Petitioner/Plaintiff–Appellant Colleen P. Collins (Collins) had completed their college education. The wedding ceremony on June 18, 2000, whose effect was suspended and the formalization of the parties' marriage on January 19, 2005 were plainly the temporal bookends of what would seem to be an emotional and economic attachment between Collins and Respondent/Defendant–Appellee John A.

Wassell (Wassell) that continued into their marriage in 2005.

Thus, the accommodation of college scholarship criteria for Collins' children was the circumstance that interrupted the symmetry of a relationship that would otherwise have manifested the parties' intent to maintain a "partnership." While for purposes of financial aid, the parties attempted to emphasize their unmarried status by representing that Collins was single on financial aid forms, signing a letter to the State Department of Health in which they represented that they had decided not to become married, and maintaining individual retirement accounts, life insurance policies, and vehicles, the parties in fact did share financially in the household expenses through a joint checking account. Collins also allowed Wassell to live in her townhouse in Pacific Heights without paying rent, while Wassel continued to receive rent from his residence in Paradise Park. In return, Wassell helped to improve the townhouse by installing a new water heater, painting some rooms, and conducting other repairs. When Collins sold the townhouse, the parties moved into Wassell's residence and a portion of the proceeds from the sale was used to pay the mortgage on Wassell's residence. Under the circumstances it would not be inequitable to give credence to the underlying basis of their relationship in distributing the assets upon dissolution of the marriage. *See Booth v. Booth,* 90 Hawai'i 413, 417, 978 P.2d 851, 855 (1999) (holding that "the family court has broad discretion to divide and distribute the estate of the parties in a 'just and equitable' manner," and "[a]s such, the family court assesses and weighs all valid and relevant considerations to exercise its equitable discretion in distributing marital property").

The *Helbush v. Helbush,* 108 Hawai'i 508, 122 P.3d 288 (App.2005), test was not helpful in resolving this case but only magnified ordinary living details beyond the significance they had in a larger more comprehensive view of the parties' relationship. Thus, respectfully, in my view the court was wrong in the ultimate conclusion it drew from the facts, but was placed on that path in its attempt to heed the *Helbush* test.[1]

What is pertinent for our purposes and what *Helbush* sought to resolve is the case that is not before us—the committed relationship that in time culminates in marriage—without the presence of a putative marriage ceremony. Parties may commit to each other without ever contemplating marriage. Thus, it is incongruous to subject such situations to the category of "economic partnerships," as based on our case law on marriage dissolution, where the parties are in a self-defined relationship before marriage. Any attempt, then, to characterize the nature of a relationship as for example, an economic partnership, seems futile and unhelpful.

Fundamentally, in determining whether and to what extent credit should be allocated between the parties for premarital assets, the touchstone must be equity. Hawai'i Revised Statutes (HRS) § 580–47;[2] *see also Myers v. Myers,* 70 Haw. 143, 148, 764 P.2d 1237, 1241 (1998) (holding that the family court has "the discretion to divide martial property according to what is just and equitable"). The definition of what is equitable in an asset distribution is necessarily committed to the proper exercise of discretion by

---

1. In *Helbush,* the Intermediate Court of Appeals (ICA) posited that "[a] 'premarital economic partnership' occurs when, prior to their subsequent marriage, a man and a woman cohabit and apply their financial resources as well as their individual energies and efforts to and for the benefit of each other's person, assets, and liabilities." *Helbush,* 108 Hawai'i at 515, 122 P.3d at 295.

2. HRS § 580–47 states in relevant part that:

(a) Upon granting a divorce, or thereafter if ... jurisdiction of those matters is reserved under the decree by agreement of both parties

or by order of court after finding that good cause exists, the court may make any further orders as shall appear just and equitable (1) compelling the parties or either of them to provide for the support, maintenance, and education of the children of the parties[.] ... (4) ... In making these further orders, the court shall take into consideration: the respective merits of the parties, the relative abilities of the parties, the condition in which each party will be left by the divorce, the burdens imposed upon either party for the benefit of the children of the parties, the concealment of or failure to disclose income or an asset .... and all other circumstances of the case.

the family court. *See Markham v. Markham,* 80 Hawai'i 274, 277, 909 P.2d 602, 605 (App.1996) (holding that the family court has "broad discretion to divide and distribute the estate of the parties"). In the exercise of that discretion, the court should determine on an equitable basis whether assets engendered during the pre-marital relationship and brought into the marriage were treated, used, or employed as joint assets without respect to how one might characterize a couple's living arrangement. The questions to be answered should be the extent to which a party substantially contributed to accumulating or obtaining the asset during the premarital relationship and whether the parties intended that and acted as though the asset was accumulated or obtained for the benefit of both of them.[3] Any formulation in excess of such a standard would hold parties to the expectations and obligations of marriage as developed in our case law, when such expectations and obligations cannot be inferred legally simply from people choosing to live together. Therefore, I concur in the result reached by the majority but on the basis set forth above.

### Dissenting Opinion by POLLACK, J.

The majority holds that a couple who expressly decide <u>not</u> to marry in order to obtain financial advantages, who agree for this reason to keep separate financial identities while cohabiting, who make this agreement to preserve significant financial aid from two colleges and to ensure that the non-parent is not financially responsible for the college education cost of the other's children, nevertheless created a premarital economic partnership.

The result of this holding means that whenever a couple cohabit before marriage and share some undefined level of expenses, their cohabitation period may be treated as if they were married if their subsequent marriage ends in divorce, with little regard accorded to the parties' intent. This result is reached because of the majority's adoption of the *Helbush* test, a standard that I believe is inherently flawed, as this case demonstrates, and should be overruled.

In my view, whether a cohabiting couple forms a premarital economic partnership should depend on the intention of the parties with consideration given to whether the parties' actions substantially conformed to their intention. Accordingly, I would remand this case to the family court to determine whether the actions of Collins and Wassell were substantially consistent with their intention to maintain separate economic identities.

### I.

In June 2000, Colleen Collins and John Wassell exchanged vows in the presence of their friends, families, and a minister. Immediately after the ceremony, they had second thoughts. Collins realized that a legal marriage would change her tax status and most likely impact her daughters' financial aid awards. Tuition for both daughters to attend prestigious mainland schools amounted to over $52,000 a year. With financial aid calculated on the basis that Collins was a single parent, Collins actually paid only $8,000 per year, a very considerable savings. To maintain her single parent status on the financial aid applications, Collins and Wassell agreed that they would not mail their marriage license and certificate to the Department of Health, and they would keep their financial identities separate. On their wedding day, the couple asked the minister to refrain from submitting the marriage license and certificate to the State Department of Health. Four months later, Collins and Wassell both signed and sent a letter to the Department of Health advising that they had not legally married after all.

After a short honeymoon, Collins and Wassell began living together in Collins' townhouse. During this 18–month period, Wassell did not contribute to the mortgage payments or pay rent to Collins, and rented out his own property. In 2001, Collins sold her property and deposited the money from the sale into a joint account, $4,239.59 of which was used to pay off Wassell's mortgage. Prior to the sale of the townhouse, Wassell made some improvements to the property, including minor repairs, painting,

---

**3.** Correspondingly, losses brought into the mar- riage may be allocated similarly.

and installing a new water heater. The couple then moved into Wassell's house.

The "joint" account was created in June 2000 when Wassell added Collins' name to an account he held at CU Hawai'i FCU. They deposited cash gifts from their June 2000 apparent wedding into the joint account. Collins and Wassell agreed to use the joint account primarily for their shared utility and grocery bills. Both parties were to deposit funds in the joint account, but in reality, Collins made regular monthly deposits of around $500.00 while Wassell made few, if any, deposits from 2000 through 2007.

The family court noted, however, that income and expense statements signed by the parties (Collins dated 9/26/08; Wassell dated 10/24/07) reflected total living expenses (not including rent paid by Collins) of $1,960.00, an amount almost four times the monthly contributions to the joint account. Wassell testified that he paid for the propane, internet, and telephone bills with funds from his individual bank account, and he paid for food between ninety and ninety-five percent of the time that he and Collins went out to eat. The court therefore rejected Collins' contention that the joint account was the primary means of payment for the parties' living expenses. On the contrary, this account covered a relatively small portion of their expenses.

The family court further found that the account was "joint" in name only, and Collins was the primary, if not exclusive, contributor to that account. For example, ten days after depositing the proceeds from the sale of her townhouse, $23,020.74, into the joint account, Collins withdrew $13,647.26 to purchase an automobile in her own name.

During the cohabitation period and into their subsequent marriage, Collins and Wassell also maintained separate individual checking and savings accounts, which appear for each to have been the vehicle for the bulk of their financial activity. Collins and Wassell both kept separate retirement accounts and individual life insurance policies to which they did not name each other as beneficiaries. While cohabiting, Collins and Wassell both purchased cars and held the titles in their individual names. During the period of premarital cohabitation from June 2000 to

January 2005, Wassell's assets and debts in his own name included:

a. Wachovia (annuity)
b. TIAA–CREF
c. Hawaii PTS Deferred
d. CU Hawaii FCU (SD–2)
e. CU Hawaii FCU (RS–2)
f. Bank of Hawaii (checking)
g. Real property located in Hawaiian Paradise Park
h. Various items of personal property

Collins' assets in her own name included:

a. VALIC (annuity)
b. HFS FCU (checking and savings)
c. Townhouse in Pacific Heights (sold in December 2001)
d. Various items of personal property

On January 19, 2005, Collins and Wassell were legally married, as there was no longer any need for Collins to submit financial aid applications for her daughters' college educations. It was at this point that Wassell testified that the agreement to maintain separate financial identities was terminated. The couple lived in Wassell's house until their separation on January 1, 2007.

The majority concludes that despite Collins and Wassell's express intention to retain their separate financial identities and despite their actions to effectuate their intention, the couple entered into a premarital economic partnership. Respectfully, I believe this result is reached because the majority gives insufficient weight to the parties' intention and because of the majority's reliance on the *Helbush* test, which is significantly flawed.

## II.

In *Helbush v. Helbush*, 108 Hawai'i 508, 122 P.3d 288 (App.2005), the ICA held that "a 'premarital economic partnership' occurs when, prior to their subsequent marriage, [two people] cohabit and apply their financial resources as well as their individual energies and efforts to and for the benefit of each other's person, assets, and liabilities." *Id.* at 515, 122 P.3d at 295 (emphasis added).

The *Helbush* standard is deficient for multiple reasons, described more fully below.

First, it does not consider the intention of the parties in determining whether a premarital economic partnership is formed or whether the parties' actions substantially conformed to their intentions. Second, because the test lacks specific factors, application of the test will inevitably be haphazard. Third, as recognized by the concurrence, the *Helbush* test subjects all couples to a single test, which manifestly misses the mark in failing to recognize the diversity of parties' intentions. Lastly, Helbush replaced an equitable standard with a categorical one. Consequently, if an economic partnership is found by the family court not to have been formed, the court's equitable discretion cannot be invoked because its authority has been replaced by the *Helbush* test.

### A.

The formation of a premarital economic partnership depends upon the intention of the parties. *See Stanford Carr Dev. Corp. v. Unity House, Inc.,* 111 Hawai'i 286, 302, 141 P.3d 459, 475 (2006) (emphasis added). In applying general partnership principles to an unmarried couple's property dispute, the ICA has stated that a partnership "exists where the parties have contracted to share, as common owners or principals, the profits of a business and . . . whether an agreement creates a partnership or not depends upon the intention of the parties." *Simmons v. Samulewicz,* 129 Hawai'i 507, 513, 304 P.3d 648, 654 (App.2013) (emphasis added) (quoting *Dang v. F and S Land Dev. Corp.,* 62 Haw. 583, 589, 618 P.2d 276, 280 (1980)). "The purported intent . . . to promote a romantic and/or anticipated marital relationship, although including financial decisions, does not constitute an intent to create a partnership." *Id.* at 514, 304 P.3d at 655. There must be something more for the court to find a valid partnership.

The standard enunciated by the ICA in *Helbush* lacked any consideration of the parties' intentions. While the majority modifies the *Helbush* test to a certain extent to include intent, Majority Opinion at 46, 323 P.3d at 1228, it does not give appropriate weight to the intentions of the parties. The intent of the parties should be the most significant factor in the court's analysis, not merely an afterthought. "[A] division of property accumulated during a period of cohabitation must be begun by inquiring into the intent of the parties, and if an intent can be found, it should control that property distribution."[1] *Beal v. Beal,* 282 Or. 115, 577 P.2d 507, 510 (1978).

As the family court explained, the most obvious example of Collins's and Wassell's intent was the couple's conscious decision not to make their marriage legal "for the express purpose of maintaining separate financial identities." This accomplished two separate purposes: it allowed Collins to take full advantage of the financial aid available for her daughters' college educations, and it enabled Wassell to avoid shouldering any share of that burden. The family court found that Collins and Wassell "agreed that they would not mail their marriage license and certificate to the Department of Health, and each of them would maintain separate financial identities" specifically to avoid the negative financial consequences of a legal marriage.

Collins does not dispute that the parties entered into this agreement, but insists that the decision not to get legally married is different than the decision not to form an economic partnership. However, the decision not to get married had, as its essential objective, the purpose to maintain separate economic identities in order to preserve significant financial aid. By keeping their economic identities separate, the parties were able to achieve their financial objective.

In the alternative, Collins argues that the decision not to get married is evidence that the parties made a "joint" financial decision that benefitted both parties. MP3: Oral Argument, Hawai'i Supreme Court, at 06:45 (Dec. 3, 2013), http://state.hi.us/jud/oa/13/

---

1. The Oregon Supreme Court expanded on its reasoning:

 While this is obviously true when the parties have executed a written agreement, it is just as true if there is no written agreement. The difference is often only the sophistication of the parties. Thus, absent an express agreement, courts should closely examine the facts in evidence to determine what the parties implicitly agreed upon.

 *Beal v. Beal,* 282 Or. 115, 577 P.2d 507, 510 (1978).

SCOA_120313_30070.mp3. In other words, Collins contends that the joint decision to maintain separate financial identities was a function of their premarital economic partnership since both of them benefitted from maintaining separate economic identities. *See* Majority Opinion at 49, 323 P.3d at 1231. This inverted analysis nullifies the couple's primary purpose of maintaining separate identities, as the financial advantage gained by maintaining separate economic identities is contended to be proof of an economic partnership.

The family court found that "[f]ar from reflecting the parties' intention to 'apply their financial resources to and for the benefit of each other's persons, assets, and liabilities,'" these facts reflected "the parties' express intention not to do so." (Citation and ellipsis omitted). Therefore, Collins and Wassell's express agreement to remain financially separate should be given significant weight and must be considered in evaluating the parties' actions.

### B.

In addition to ignoring the parties' intentions, *Helbush* does not provide guidance as to how the family court should measure other factors, including cohabitation[2] and the commingling of expenses, which may lead to inconsistent results.

### 1.

As stated, "whether an agreement creates a partnership or not depends upon the <u>intention</u> of the parties." *Simmons v. Samulewicz*, 129 Hawai'i 507, 513, 304 P.3d 648, 654 (App.2013) (emphasis added). The majority notes that, "[a]bsent an express agreement, in evaluating whether the parties intended to form a premarital economic partnership, the family court must consider the totality of the circumstances, including both the economic and non-economic contributions of the par-

ties." Majority Opinion at 45–46, 323 P.3d at 1227–28 (citing *Cassiday v. Cassiday*, 68 Haw. 383, 387, 716 P.2d 1133, 1136 (1986)) (emphasis added).

In this case, it is unnecessary to consider the totality of the circumstances to determine whether the parties intended to form a premarital economic partnership, as the record unequivocally demonstrates that the parties intended to maintain separate economic identities.[3] The family court was clearly not erroneous in finding that Collins and Wassell agreed that "each of them would maintain separate financial identities."

Nevertheless, the majority evaluates the totality of circumstances from its perspective and reaches the opposite conclusion regarding the parties' intent: "Collins's interest in receiving financial aid as a single parent is not sufficient to override the parties' <u>apparent intent</u> to engage in a premarital economic partnership in all other aspects of their financial lives." Majority Opinion at 49, 323 P.3d at 1231 (emphasis added).

Respectfully, I do not agree that the record indicates that the parties' "apparent intent" superseded their express intent. This court <u>should not re-determine</u> the parties' intention by giving little deference to the parties' express intention to maintain separate economic identities. The majority is able to override the parties' actual intention because of the inherent flaw of the *Helbush* test, which does not include the parties' intentions as part of its formulation in determining whether a premarital economic partnership existed. And while the majority states that "[w]hether a premarital economic partnership has been formed depends upon the intention of the parties," Majority Opinion at 45, 323 P.3d at 1227, it is abundantly clear that the *Helbush* test, even as modified by the majority, gives minimal weight to the parties' express intentions, enabling a court

---

**2.** Couples can apply "their financial resources as well as their individual energies and efforts to and for the benefit of each other's person, assets and liabilities" with or without cohabitation. Couples with one or both individuals in the military may not live together before marriage. Others may choose not to for religious reasons.

**3.** "[C]ohabitation, no matter for how long, does not by itself prove the existence" of either an

express agreement or contract implied-in-fact entitling a cohabitant to equitable division of separate property acquired or improved during cohabitation. *See Aehegma v. Aehegma*, 8 Haw. App. 215, 222–223, 797 P.2d 74, 79 (App.1990); *Chen v. Hoeflinger*, 127 Hawai'i 346, 359, 279 P.3d 11, 24 (App.2012); *Simmons v. Samulewicz*, 129 Hawai'i at 515, 304 P.3d at 656.

to infer an "apparent intent" to override express intent.

In contrast to *Helbush*, I believe the more appropriate and equitable analysis is to assess whether the parties' actions were substantially consistent with their express intention to maintain separate economic identities.

### 2.

*Helbush* also provides no guidance as to what level of sharing of resources or commingling of finances is necessary to constitute an economic partnership. *Helbush's* ambiguous test appears to be nearly unlimited: a premarital economic partnership is established when a couple who, prior to their marriage, cohabit and "apply their financial resources as well as their individual energies and efforts to and for the benefit of each other's person, assets, and liabilities." *Helbush*, 108 Hawai'i at 515, 122 P.3d at 295 (emphasis added). The test is overly expansive, in failing to account for the fact that couples may apply their financial resources and energies for the benefit of each other but decisively not intend to form an economic partnership. At the same time, the test is unduly narrow, in requiring cohabitation and therefore not including circumstances where one member of a couple is in the military and not living with the other, or one member is working or attending college in another location.

Sharing of some economic expenses and household responsibilities is a basic part of nearly any cohabitating relationship. The family court aptly observed:

> Parties who are emotionally involved with one another and who are cohabiting must inevitably comingle their energies and finances to some extent—the exigencies of normal life and collective activity could scarcely allow it to be otherwise. Therefore, some measure of such commingling is to be expected in every instance of cohabitation, and does not by its mere existence rise to the level necessary to establish a *Helbush* "economic partnership."

(Emphasis added).

For the *Helbush* test to be meaningful, it should require a significant level of applying financial resources to the benefit of the other such that separate economic identities are no longer separate. The difficulty in defining such a standard should not result in the absence of one.

In this case, the degree of financial cooperation in the family court's view did not rise to the level of a premarital economic partnership precisely because the couple maintained "distinct separate financial identities." The court noted that at all times during the period of the couple's premarital cohabitation, in addition to their single joint "housekeeping" account, each of the parties maintained separate individual checking, savings, and retirement accounts, life insurance policies, purchased cars in their own names, and kept other parts of their financial lives independent. While it is true that the parties' maintenance of separate financial accounts does not, in and of itself, support the ultimate determination that no premarital economic partnership was formed, *see Epp v. Epp*, 80 Hawai'i 79, 93, 905 P.2d 54, 68 (App.1995), such actions coincided with the couple's express intention to maintain separate financial identities.

The majority places undue reliance on the parties' maintenance of a joint bank account, which would appear to be a more convenient way to pay shared bills than a reflection of a determination to no longer maintain separate financial identities. The family court found that although the joint account "no doubt reflected a measure of financial cooperation by the parties, [ ] it seems wholly inadequate to carry the weight of establishing an economic partnership between them." Indeed, as the ICA noted in *Aehegma*, joint checking accounts between cohabitants do not prove an express agreement for the equitable division of separate property acquired or improved during cohabitation, in the absence of clear and convincing evidence of such intent. 8 Haw.App. 215, 222, 797 P.2d 74, 79 (1990) (considering HRS § 560:6–103(a)). While Collins and Wassell undoubtedly shared small expenses, the facts reveal that they kept large purchases and expenditures separate, except for the modest amount to pay off Wassell's mortgage.

The *Helbush* test, as applied here, produces more questions than answers. For example, Collins argues that the family court relied on irrelevant factors, including the parties' admitted use of separate financial accounts, her single parent status on her

daughters' financial aid forms, and the parties' letter to the Department of Health advising that they did not get married in June 2000. But if *Helbush* does not articulate which factors are relevant to the analysis, it is difficult to know which factors are irrelevant. In this case, the parties shared small expenses but kept large purchases separate. *Helbush* does not shed light on whether a single large joint purchase would counter a couple's actions in keeping all other financial transactions separate.

Finally, it may be extremely difficult to determine when a premarital economic partnership begins and ends. A cohabitation relationship may evolve such that a couple's applications of financial resources for the benefit of the other changes over time.

As Justice Acoba points out in his concurrence, the *Helbush* test "was not helpful in resolving this case but only magnified ordinary living details beyond the significance they had in a larger more comprehensive view of the parties' relationship." Concurring Opinion at 50, 323 P.3d at 1232. Rather than dissecting each and every expense, family courts should focus on the underlying issue: did the parties substantially maintain their separate economic identities? Application of this standard would require determining the parties' intentions and consideration of whether their actions were substantially consistent with that intent.

### C.

Because *Helbush*, as modified, does not depend upon the parties' intentions and actions effectuating such intentions, application of *Helbush* may lead to challenges of otherwise valid prenuptial agreements. The Hawai'i Uniform Prenuptial Agreement Act (HUPAA) states that parties to a premarital agreement may contract with respect to:

(1) The rights and obligations of each of the parties in any of the property of either or both of them whenever and wherever acquired or located;

(2) The right to buy, sell, use, transfer, exchange, abandon, lease, consume, expend, assign, create a security interest in, mortgage, encumber, dispose of, or otherwise manage and control property;

(3) The disposition of property upon separation, marital dissolution, death, or the occurrence or nonoccurrence of any other event.

HRS § 572D–3 (2006). The HUPAA requires that the agreement be made in writing and signed by both parties. HRS § 572D–2 (2006). The agreement, which becomes effective upon marriage under HRS § 572D–4 (2006), is enforceable and shall be binding unless the party against whom enforcement is sought proves: "(1) That party did not execute the agreement voluntarily; or (2) The agreement was unconscionable when it was executed[.]" HRS § 572D–6 (2006); *see also Lewis v. Lewis*, 69 Haw. 497, 500–01, 748 P.2d 1362, 1366 (1988).

The HUPAA provides that an agreement is unconscionable when it was executed and, before execution of the agreement, if a party to the agreement:

(A) Was not provided a fair and reasonable disclosure of the property or financial obligations of the other party;

(B) Did not voluntarily and expressly waive, in writing, any right to disclosure of the property or financial obligations of the other party beyond the disclosure provided; and

(C) Did not have, or <u>reasonably could not have had, an adequate knowledge of the property or financial obligations of the other party.</u>

HRS § 572D–6(2) (2006) (emphasis added). The vagaries of the *Helbush* test and the unpredictability of its application may result in unconscionability challenges to the validity of a premarital agreement where the parties divorce, inasmuch as a party that had been involved in a cohabitation relationship prior to marriage would likely not have <u>adequate knowledge</u> of financial obligations that may have existed between the couple as a result of the *Helbush* standard.

In this case, Collins and Wassell orally agreed to maintain separate financial identities, but did not memorialize their agreement in writing. If an agreement had been signed, this case would be resolved easily based upon their written intention. Because there was no signed agreement, Collins and Wassell are subject to an ambiguous standard that they, like the vast majority of couples, had no reason to know existed.

Wassell has argued that a "deal is a deal," as is the usual course in contract and partnership law. MP3: Oral Argument, Hawai'i Supreme Court, at 32:20 (Dec. 3, 2013), http://state.hi.us/jud/oa/13/SCOA_120313_30070.mp3. The couple's "deal" was neither inequitable nor entered into involuntarily. But because the *Helbush* test, as modified, gives inadequate weight to the parties' intention, the agreement is not honored.

Respectfully, application of a test that determined whether Collins' and Wassell's actions were substantially consistent with their intention to maintain separate financial identities would be more consistent with HUPAA, the Partnership Model, and the parties' expectations, as it would respect their express intentions.

### D.

The *Helbush* standard's one-size-fits-all approach is inappropriate for gauging the financial relationship of partners in a premarital relationship, which is based upon the premise that all cohabitation relationships can be divided into two categories: economic partnership or non-economic partnership. In *Marvin v. Marvin,* a watershed case concerning premarital rights, the California Supreme Court recognized that partners may enter into a wide variety of economic arrangements:

> [T]hey may agree to pool their earnings and to hold all property acquired during the relationship in accord with the law governing community property; conversely they may agree that each partner's earnings and the property acquired from those earnings remains the separate property of the earning partner. So long as the agreement does not rest upon illicit meretricious consideration, the parties may order their economic affairs as they

choose, and no policy precludes the courts from enforcing such agreements.

18 Cal.3d 660, 134 Cal.Rptr. 815, 557 P.2d 106, 116 (1976) (emphasis added) (footnote omitted). In creating separate categories of marital property, Hawai'i courts have likewise recognized that not all partners strive to advance the family and marital unit in every endeavor, and many do not share this expectation.[4] It is therefore problematic to apply the *Helbush* test, which casts parties' expectations in all-or-nothing terms. The family court acknowledged that in applying *Helbush,* "there is no such thing, for these purposes, as a 'partial partnership.'"

As this court has stated, "each [marital] case is factually and circumstantially unique, and therefore outcomes will necessarily be diverse." *Gussin v. Gussin,* 73 Haw. 470, 486, 836 P.2d 484, 492 (1992). Extending the *Helbush* test to all cohabitation situations is not constructive. As noted by the concurrence, "where the parties are in a self-defined relationship before marriage, [a]ny attempt, then, to characterize the nature of a relationship as for example, an economic partnership, seems futile and unhelpful." Concurring Opinion at 50, 323 P.3d at 1232.

### E.

Finally, the *Helbush* standard is flawed because it undermines the discretion that family courts previously enjoyed under the equitable powers doctrine.[5]

Under HRS § 580–47, the family court is vested with wide discretion in dividing marital property according to what is "just" and "equitable." *Tougas v. Tougas,* 76 Hawai'i 19, 26, 868 P.2d 437, 444 (1994) (citing *Gussin,* 73 Haw. at 479, 836 P.2d at 489). Accordingly, each case must be decided upon its

---

**4.** The ICA has recognized that not all partners share the expectation that both strive to "advance the family and the marital unit." Calvin G.C. Pang, *Slow–Baked, Flash–Fried, Not to be Devoured: Development of the Partnership Model of Property Division in Hawai'i and Beyond,* 20 U. Haw. L. Rev. 1, 92 (1998).

> By creating a category of "marital separate property" into which spouses may affirmatively and clearly segregate separate property from the partnership, the court allowed spouses to "switch off" the partnership rules for those

properties. Those who feel strongly enough to buck the norms of marital sharing are given both the method to, and the burden of, setting alternative expectations.

*Id.* at 93 (footnotes omitted).

**5.** In her application, Collins raises two additional questions not reached by the majority. She asked whether the rule set forth in *Helbush* precludes the family court from considering premarital contributions in the absence of a premarital economic partnership.

own facts and circumstances. *Gussin*, 73 Haw. at 479, 836 P.2d at 489 (citing *Carson v. Carson*, 50 Haw. 182, 183, 436 P.2d 7, 9 (1967)).

Hawai'i family courts adhere to the Partnership Model, which allows for discretion in determining whether deviation is warranted. *Helbush*, 108 Hawai'i at 513–14, 122 P.3d at 293–94.

The Partnership Model requires the family court, when deciding the division and distribution of the Marital Partnership Property of the parties part of divorce cases, to proceed as follows: (1) find the relevant facts; start at the Partnership Model Division and (2)(a) decide whether or not the facts present any valid and relevant considerations authorizing a deviation from the Partnership Model Division and, if so, (b) itemize those considerations; if the answer to question (2)(a) is "yes," exercise its discretion and (3) decide whether or not there will be a deviation; and, if the answer to question (3) is "yes," exercise its discretion and (4) decide the extent of the deviation.

*Helbush*, 108 Hawai'i at 514, 122 P.3d at 294 (citing *Jackson v. Jackson*, 84 Hawai'i 319, 332–33, 933 P.2d 1353, 1366–67 (App.1997)). In determining whether other relevant considerations warrant deviation from the Partnership Model, the family court is further directed to consider "the respective merits of the parties, the relative abilities of the parties, the condition in which each party will be left by the divorce, the burdens imposed upon either party for the benefit of the children of the parties, and all other considerations of the case." *Jackson*, 84 Hawai'i at 333, 933 P.2d at 1367 (quoting HRS § 580–47(a) (1993)).[6]

To the extent that a certain degree of "uniformity, stability, clarity or predictability" of family court decisions can be attained, while at the same time preserving the wide discretion mandated by HRS § 580–47, judges are compelled to apply the appropriate law to the facts of each

case and be guided by reason and conscience to attain a just result.

*Gussin*, 73 Haw. at 486, 836 P.2d at 492.

Hawai'i family courts have "avoided, where possible, the adoption of general rules governing the division of marital assets ... because such general rules create rebuttable presumptions, which narrow the discretion of family court judges, and are thus repugnant to HRS § 580–47." *Id.* at 480, 836 P.2d at 489 (citation omitted). The Partnership Model of marriage provides the necessary guidance to the family courts in exercising their discretion. *Id.* at 486, 836 P.2d at 492.

The family court, traditionally accorded wide discretion in dividing marital property, may exercise its equitable powers in coming to a just result even if there is no premarital economic partnership. *See Gussin*, 73 Haw. at 479, 836 P.2d at 489 (1992); *see also* HRS § 580–47(a) ("[T]he court shall take into consideration ... all other circumstances of the case."). The *Helbush* test undermines the broad discretion that family court previously exercised in dividing marital property according to what is "just and equitable," *Tougas*, 76 Hawai'i at 26, 868 P.2d at 444, and instead the court is now constrained by a categorical determination of whether a premarital economic partnership was established.

## III.

In the instant case, the family court rendered the non-clearly-erroneous finding that "[f]ar from reflecting the parties' intention to 'apply their financial resources to and for the benefit of each other's persons, assets, and liabilities,'" these facts reflected "the parties' express intention not to do so." (Citation and ellipsis omitted). *See Maria v. Freitas*, 73 Haw. 266, 272, 832 P.2d 259, 263 (1992) ("On the contrary, the facts demonstrate a deliberate design to keep their property separate.").

Accordingly, I would remand to the family court to determine whether Collins' and Wassell's actions were substantially consistent

---

**6.** HRS § 580–47(a) has remained substantially unchanged since 1993. See HRS § 580–47(4)

(Supp.2011).